790 A.2d 83

Christian E. CHINWUBA

v.

Steven B. LARSEN, et al.

No. 2298, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Jan. 31, 2002.

328

See also 133 Md.App. 375, 758 A.2d 539.

332

334

336

Sunanda K. Holmes, Chevy Chase, for appellant.

Randolph S. Sergent, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Dorothy Wilson on the brief), Baltimore, for appellees.

Argued before DEBORAH S. EYLER, ADKINS and THEODORE G. BLOOM (Retired, Specially Assigned), JJ.

ADKINS, Judge.

Does serving notice of a tort claim against a State agency on the Attorney General, instead of on the Treasurer, substantially comply with the notice requirements of the Maryland Tort Claims Act? Does a public official act within the scope of his public duties when he makes statements and disclosures to the press in violation of a statute that specifically prohibits such publications? Does the Commissioner of the Maryland Insurance Administration, as the head of an independent State agency, have an absolute privilege to make defamatory public statements about persons under agency investigation? In this appeal, we answer "no" to each of these novel questions.

This is another appellate chapter arising from the misfortunes of PrimeHealth Corporation ("PrimeHealth"), a defunct Maryland health maintenance organization ("HMO"). Christian Chinwuba, M.D., appellant, was the primary owner of PrimeHealth, until the State placed the insolvent HMO into receivership. In this case, Chinwuba complains about certain statements and actions of the Maryland Insurance Administration (the "MIA") and its commissioner, Steven B. Larsen (the "Commissioner"), appellees, during the investigation leading up to that receivership.

In the Circuit Court for Prince George's County, Chinwuba filed a four count complaint against the MIA and Larsen, alleging defamation, false light invasion of privacy ("false light"), abuse of process, and violation of due process under Articles 24 and 26 of the Maryland Declaration of Rights. The MIA and Larsen successfully moved to transfer the case to the Circuit Court for Baltimore City, and then moved to dismiss the complaint, or, in the alternative, for summary judgment. That court held that Chinwuba's

> [c]laims should properly be dismissed for ... (1) failure to comply with the Maryland Tort Claims Act, (2) the Commissioner falls within the [s]tatutory and [c]ommon [l]aw [i]mmunity, (3) the Commissioner falls within absolute privilege and some statements fall within the [j]udicial [p]roceedings [p]rivilege and, (4) failure to state a claim for [a]buse of

[p]rocess, and (5) [Chinwuba] received [d]ue [p]rocess and failed to allege harm to any cognizable interest.

On appeal, Chinwuba challenges all of these adverse decisions, arguing:

I. The Circuit Court for Prince George's County erred in transferring the case to Baltimore City.

II. The Circuit Court for Baltimore City erred in dismissing all four counts of his complaint, because

A. he substantially complied with the notice requirements of the Maryland Tort Claims Act ("MTCA"), by serving his complaint on the Attorney General;

B. Larsen did not have governmental immunity to make statutorily prohibited statements and disclosures about the substance of the MIA's charges against Prime-Health and Chinwuba, during the midst of the MIA's investigation and examination of PrimeHealth;

C. Larsen did not have an absolute privilege, as the head of a State agency, to make statements that damaged Chinwuba's reputation, and he lost any conditional privilege to do so by making statements in violation of the nondisclosure statute he was charged with enforcing;

D. the absolute privilege for statements made in judicial proceedings cannot shield Larsen from liability for his statements to the press;

E. Chinwuba adequately alleged an abuse of process; and

F. there were factual disputes over whether Chinwuba received due process.

Chinwuba's appeal raises three new questions (discussed *infra* in parts A, B, and C of section II), regarding the circumstances in which the Commissioner of the MIA may be held liable for making allegedly tortious publications to the press during an MIA investigation.

Although we find no error in the transfer, we agree with Chinwuba that his complaint should not have been dismissed in its entirety. In particular, we conclude that, if Larsen made public statements that defamed Chinwuba or placed him

in a false light, and if he did so in violation of a statute that required him to refrain from making such statements, then Larsen stepped outside any immunity or privilege protections that his public office afforded him. Given the allegations in Chinwuba's complaint and the newspaper articles attached to it, we hold that Chinwuba stated cognizable claims for defamation and false light. We shall affirm the judgments in favor of the MIA and in favor of Larsen on the abuse of process and due process counts, but vacate the judgments entered in Larsen's favor on the defamation and false light counts.

## FACTS AND LEGAL PROCEEDINGS

■ Appellees moved to dismiss Chinwuba's complaint, and, in the alternative, for summary judgment. In reviewing the dismissal of a complaint, we credit the allegations of the complaint, and draw all reasonable inferences in favor of the plaintiff. *See Shah v. HealthPlus, Inc.,* 116 Md.App. 327, 332, 696 A.2d 473, *cert. denied,* 347 Md. 682, 702 A.2d 291 (1997). Consequently, this opinion features Chinwuba's version of events, even though a fact-finder ultimately may not accept that version as true. In particular, we are required to assume for purposes of this appeal that the statements about which Chinwuba complains were both false and harmful to his reputation.[1]

### *PrimeHealth's Certification As A Maryland HMO*

Dr. Chinwuba, a radiologist, had an ownership share in PrimeHealth, through ownership of PrimeHealth's sole shareholder,[2] and was the sole owner of Diagnostic Health Imaging

---

1. In the trial court and in this Court, Larsen argued that he was entitled to summary judgment because the statements and publications in question were true. The trial court did not reach that issue, and consequently, neither will we. *See Davis v. DiPino,* 337 Md. 642, 650, 655 A.2d 401 (1995); *Antigua Condo. Ass'n v. Melba Investors Atlantic, Inc.,* 307 Md. 700, 719, 517 A.2d 75 (1986). Given our disposition of this appeal, however, Larsen may raise that issue on remand.

2. Chinwuba owned 81 percent of Goldmark Friendship, LLC ("Goldmark"), which, in turn, owned 100 percent of PrimeHealth.

Systems, Inc. ("DHIS"). In November 1995, PrimeHealth applied to the MIA for a certificate of authority to operate as an HMO in Maryland. In support of the application, Chinwuba submitted an affidavit describing a transfer of certain medical equipment by DHIS to PrimeHealth. The purpose of the transfer was to ensure that PrimeHealth had a minimum surplus of $1.5 million in assets, as required by the MIA's solvency standards for health maintenance organizations. In its initial audit, the MIA raised concerns that PrimeHealth did not meet this requirement. With the "acquisition" of the medical equipment from DHIS, PrimeHealth had sufficient assets to satisfy the standard. In December 1996, however, "DHIS became totally operationally defunct."

Based on the effect of this transfer on DHIS, the MIA became concerned that DHIS creditors might be able to challenge it as a fraudulent conveyance. On August 28, 1996, the MIA asked Chinwuba to provide a notarized statement disclosing "[a]ny and all liabilities or debts of DHIS, and any and all liens or encumbrances on the assets of DHIS immediately preceding the gift of assets to PrimeHealth." Chinwuba was asked to attest that neither he nor DHIS was aware of any creditors "that could have the gift of DHIS' accounts receivable and equipment set aside or annulled to satisfy their claim or levy" or "that would force DHIS to file for bankruptcy in the foreseeable future."

Chinwuba responded to the MIA's request on September 6, 1996. He provided a notarized certification disclosing debts secured by the equipment and DHIS's general debts and liabilities, including accounts payable, taxes, and deferred revenue. That same day, an MIA examiner contacted Chinwuba by facsimile letter to request that he specifically attest that "DHIS does not have any other liabilities or debts or any liens or encumbrances on the assets of DHIS immediately preceding the gift of assets to PrimeHealth with exception [of] those stated in this confirmation."

Immediately upon receipt of this request, Chinwuba revised his certification to include verbatim the language requested by

the MIA examiner. He submitted this revised and notarized certification to the MIA on the same day.

Later that day, Chinwuba became concerned about whether the revised certification was completely accurate. In an effort to correct the revised certification, he created a third certification. This unnotarized certification differed from the second certification by a single word. Chinwuba added the word "contributed" to his previous statement that "DHIS does not have any other liabilities or debts or any liens or encumbrances on the assets of DHIS. . . ." The third certification qualified that assertion by stating that "DHIS does not have any other liabilities or debts or any liens or encumbrances on the 'contributed' assets of DHIS[.]" In November 1996, relying on Chinwuba's statements in all three certifications, the MIA granted PrimeHealth a certificate of authority to operate as an HMO.

### Concerns About Chinwuba's Representations To The MIA

By early 1998, the MIA claimed that it had discovered millions of dollars in judgments against DHIS, that these judgments had been in existence when DHIS transferred the medical equipment to PrimeHealth, and that none of these judgments had been disclosed in any of Chinwuba's certifications. In a March 11, 1998 letter, Commissioner Larsen informed PrimeHealth that the MIA had "grave concerns covering a number of critical areas relating to PrimeHealth's ongoing ability to maintain licensure," and outlined those concerns. The opening paragraph of the letter acknowledged that the MIA already had begun a "review" of the gift of medical equipment that Chinwuba certified had been made by DHIS to PrimeHealth.

> As you know, the [MIA] has been conducting a review of PrimeHealth's status as a licensee in light of recent disclosures that have come to light relating to the company's ownership and to the status of certain assets that were gifted to PrimeHealth in order to satisfy statutory solvency requirements. Frankly, facts gleaned from our review, and in particular your responses to recent inquiries by this

agency, have served to raise more questions than have been answered.... If written responses are not provided as set forth on page 8 of this letter which fully and adequately address the concerns set forth, the [MIA] will have no choice but to pursue appropriate action authorized under the laws of this State.

Among the cited concerns were DHIS liabilities at the time of the "gift," Chinwuba's failure to disclose such liabilities in his certifications to the MIA, and allegedly conflicting statements regarding the ownership and management of PrimeHealth.

With respect to the DHIS liabilities, Larsen wrote that "[r]ecently, during the course of our investigation, the [MIA] has uncovered a substantial number of judgments against DHIS which existed at the time of the conveyance of the equipment to PrimeHealth and which have not been extinguished in the court records of Prince George's County." Larsen specifically stated that "[t]he veracity of [Chinwuba's] critical notarized statement [regarding the existence of creditors that could challenge the DHIS transfer of the medical equipment to PrimeHealth] is ... in doubt." Asserting that he "intend[ed] to continue [his] inquiry into this matter," Larsen demanded "a full explanation as to why Dr. Chinwuba certified that no additional judgments existed when the court records clearly indicate otherwise; ... and why the [MIA] should not have concerns relating to the management based on the criteria listed above."

PrimeHealth responded through its attorneys, by letter dated March 27, 1998. The letter was accompanied by affidavits and attachments that purported to address "the three areas of concern, ownership/control, the transfer of assets to PrimeHealth, and the fitness of management, which were raised in [Larsen's] letter of March 11." PrimeHealth interpreted the MIA's concerns regarding its management team as related to "your interpretation of Dr. Chinwuba's notarized statement of September 6, 1996." In the letter and a supporting affidavit, PrimeHealth took the position that "Dr. Chinwuba was correct in his assertion that the subject equipment was

unencumbered at the time it was transferred to PrimeHealth, except as otherwise disclosed to the [MIA]."

Larsen replied to PrimeHealth's explanation letter, by letter dated March 31, 1998, which set forth "new and continued concerns." The MIA issued a draft "Limited Scope Examination Report" (the "proposed report"), detailing various deficiencies in PrimeHealth's operations.[3] Among the matters addressed in the proposed report were Chinwuba's certifications regarding the transfer of medical equipment. The proposed report stated that those certifications were false and misleading, in that they failed to disclose the DHIS liabilities.

### *Larsen's Statements And Disclosures To The Press*

Chinwuba alleged in his complaint that "[s]ometime in February and March 1998, Larsen ... released his March 11th letter, PrimeHealth's March 27th letter and other documents to the media and the public .... and made verbal statements regarding his investigation of PrimeHealth and Chinwuba to the media and the public." These disclosures resulted in "numerous articles published in the *Baltimore Sun* and *Washington Post*," copies of which Chinwuba attached as exhibits to his complaint.

These articles initially related to a controversy involving a former Maryland state senator, who was then under investigation for exchanging political favors for improper payments, including payments from PrimeHealth. Later, the focus of the articles became PrimeHealth itself, and included references to Chinwuba and Larsen's contentions that Chinwuba had used deception to obtain MIA certification. They outlined the MIA's investigation, charges, and viewpoint, and named Larsen as a source of information. Stories attributed to information that Larsen allegedly provided during this period included the following articles:

---

**3.** The trial court stated that an initial draft of the proposed report was issued on March 31, 1998. The MIA advised the Prince George's court that the proposed report "was issued on March 28th, 1998."

- Charles Babington & Avram Goldstein, *Top Official Questions Md. HMO's License, Wash. Post,* Mar. 13, 1998, at B1.

 Maryland's top insurance regulator has expressed "grave concerns" about whether ... PrimeHealth Corp., can keep its license to serve Medicaid patients because of unanswered questions about who owns the firm and how it obtained many of its assets....

 In a sternly worded letter delivered Wednesday to Prime-Health's president, ... Larsen said PrimeHealth has until March 20 to answer questions about who owns the company and whether it has clear title to its assets. Otherwise, the commissioner will take "appropriate action," the letter said.... Larsen demanded sworn testimony explaining what he called contradictory documents, and he threatened to invoke perjury laws if, for example, PrimeHealth fails to reveal who its true owners are....

 Questions about PrimeHealth center on its relationship with DHIS.... On Sept. 6, 1996, Chinwuba wrote that he knew of no indebtedness "that could set aside, annul or challenge" his gift to PrimeHealth, Larsen's letter said. In light of the numerous liens existing then and now, Larsen's letter said, "the veracity of this critical notarized statement is therefore in doubt."

- Walter F. Roche, Jr. & Scott Higham, *Officials reviewing PrimeHealth documents, Balt. Sun,* Apr. 1, 1998 (online version).

 Maryland insurance officials said yesterday they will spend the weekend reviewing documents delivered by Prime-Health Corp. to determine whether the Lanham-based company should continue to operate in Maryland as a health maintenance organization.

 In the midst of two grand jury investigations of [a] former [state senator] and his ties to health companies such as PrimeHealth, the Maryland Insurance Administration ordered a sweeping review of the company last month....

Insurance Commissioner Steven B. Larsen extended a deadline until yesterday for PrimeHealth to answer questions about the ownership of the company and its financial stability. Larsen said the company delivered documents late yesterday, and agency officials will review them before making any decision.... Larsen said in his letter that the company failed to disclose judgments against the firm totaling about $3 million.

- Charles Babbington, *Insurance Chief Urges Md. To Curb Payments to HMO, Wash. Post,* Apr. 2, 1998, at D7.

Maryland's insurance commissioner said yesterday that state payments to Lanham-based PrimeHealth Corp. should be suspended or placed under state control because the managed care company has not provided adequate answers to questions about its debts and ownership.

Commissioner Steven B. Larsen asked the state health department to withhold further Medicaid reimbursements to PrimeHealth or to place them in "a supervised bank account" that essentially would give the state control over how the company uses its money. In a letter to PrimeHealth, Larsen said he continues to worry "about possible fraudulent conveyances" of valuable medical equipment that was crucial to PrimeHealth's start-up in 1996.

The letter was the latest blow to the Prince George's County health maintenance organization.... At Larsen's request last month, the health department delayed payment of nearly $2.5 million to PrimeHealth, and an official said that money would continue to be held for the time being.... PrimeHealth officials .... would not answer questions yesterday about Larsen's latest letter.... Larsen has questioned the truthfulness of affidavits filed by the company. PrimeHealth last week acknowledged that its primary owner is radiologist Christian E. Chinwuba, who was not identified as owner in those affidavits. Another Chinwuba company, Diagnostic Health Imaging Services, was more than $6 million in debt when he shifted its most valuable medical equipment to PrimeHealth.

Larsen has said Diagnostic Health's creditors might make legal claims against PrimeHealth's assets to settle debts.

In his letter yesterday, Larsen said PrimeHealth has been "completely inconsistent" in its explanations of Diagnostic's debts and their possible effect on PrimeHealth.... Larsen wrote: "I am concerned that PrimeHealth may be using Medicaid funds to pay the debts of an unrelated, unlicensed corporation."

### *PrimeHealth's Receivership And Finalization Of The MIA's Proposed Report*

On August 23, 1998, the Commissioner initiated receivership proceedings against PrimeHealth in the Circuit Court for Baltimore City. Among the cited reasons were that Prime-Health's management had provided inconsistent, false, and misleading information to the MIA in order to obtain licensing and during the investigation.

In September 1998, PrimeHealth filed exceptions to the proposed report, and requested a hearing on the proposed report and exceptions. As a result of negotiations with the State, on October 1, 1998, PrimeHealth agreed to the receivership in a consent order. As receiver under the consent order, the Commissioner withdrew PrimeHealth's hearing request.[4]

On November 25, 1998, Chinwuba's counsel filed exceptions to, and requested a hearing on, the proposed report, purportedly on behalf of unidentified "owners, officers and directors of PrimeHealth[.]" Citing the consent order and the receivership, an MIA hearing officer ruled that PrimeHealth's owners, officers and directors lacked standing to challenge the proposed report. Nevertheless, Chinwuba was allowed to submit information in support of his exceptions to the proposed report. He did so on December 31, 1998. Responding to Chinwuba's exceptions point-by-point, the MIA filed an addendum to the proposed report.

---

4. This Court upheld this withdrawal. *See PrimeHealth Corp. v. Ins. Comm'r*, 133 Md.App. 375, 394, 758 A.2d 539 (2000).

On March 3, 1999, the Commissioner petitioned the circuit court to approve the proposed report, as amended. On March 4, the court did so. On March 8, 1999, the Commissioner finally adopted the report, which included the MIA's addendum, PrimeHealth's exceptions, depositions of Chinwuba and others, and all of the material submitted by Chinwuba.

On March 12, 1999, Chinwuba and Goldmark Friendship, LLC ("Goldmark"), filed a motion to reconsider the March 4 order authorizing the Commissioner to finalize the report. On April 7, 1999, Chinwuba filed on his own behalf a petition for judicial review of the order finalizing the report. On April 12, Chinwuba's attorney also filed separate petitions for judicial review on behalf of Goldmark and PrimeHealth.

On May 10, the Baltimore City Circuit Court dismissed the petition filed on behalf of PrimeHealth, because it constituted a collateral attack on the consent order. Chinwuba, purportedly on behalf of PrimeHealth, appealed that dismissal to this Court.

### This Action And Other Related Suits

On June 21, 1999, Chinwuba filed this suit, in the Circuit Court for Prince George's County. Chinwuba alleged, *inter alia*, that "[s]ometime in February and March 1998," Larsen released his March 11 letter, PrimeHealth's March 27 reply letter, "and other documents to the media and the public." He complained that Larsen's disclosures were both defamatory and in violation of the Maryland Insurance Code. He alleged that "Larsen's unlawful defamatory statements were the subjects of numerous articles published in the *Baltimore Sun* and *Washington Post* from February or March 1998." He attached to his complaint a number of articles, including those excerpted above, and other later-published ones.

In August 1999, Goldmark filed another action in the Baltimore City Circuit Court, seeking to prevent the sale of PrimeHealth in the receivership proceedings. It argued that PrimeHealth's president had not been authorized to consent to the receivership and that PrimeHealth was not insolvent.

With two petitions for judicial review filed by Chinwuba and Goldmark still pending in Baltimore City Circuit Court, and Goldmark's separate action to stop the sale of PrimeHealth also pending in the Baltimore City court, the MIA and the Commissioner moved to either dismiss or transfer Chinwuba's Prince George's County complaint. After consulting with the administrative judge in Baltimore, the administrative judge for the Prince George's County Circuit Court ordered this action transferred to Baltimore City.

After the transfer, the MIA and Larsen renewed their motion to dismiss, or, in the alternative, for summary judgment. The trial court granted the motion. In a written opinion and order, the court held that Chinwuba's failure to serve the Treasurer barred all of his claims. As alternative reasons for dismissing the claims, the court also concluded that the claims were barred by governmental immunity, because "nothing in the Complaint properly alleges any conduct outside of the scope of the Commissioner's public duties," and Chinwuba failed to allege with specificity any facts from which an inference of malice could be drawn. With respect to the individual counts, the court dismissed the defamation and false light counts because the statements Chinwuba complained about were either protected by absolute privilege for judicial proceedings, or protected by absolute privilege for the head of a state agency acting in the course of his official duties. He dismissed the abuse of process count because the complaint did not allege any misuse of process or any legally cognizable damage. He granted summary judgment on the due process count because, *inter alia*, Chinwuba did not request the hearing he claims he should have gotten. This appeal followed.

## DISCUSSION

### I.

### The Trial Court Did Not Err In Transferring The Case

We first address Chinwuba's contention that the trial court erred in granting appellees' motion to transfer this case from

Prince George's County, where Chinwuba lives, to Baltimore City, where other cases involving the same parties were pending. Chinwuba argues that the transfer improperly deprived him of his choice of venue and his right to a jury trial. We disagree.

 Under Md. Rule 2–327(d),

[i]f civil actions involving one or more common questions of law or fact are pending in more than one judicial circuit, the actions ... may be transferred ... for consolidated pretrial proceedings or trial to a circuit court in which ... the actions to be transferred might have been brought, and ... similar actions are pending.... A transfer under this section shall not be made except upon ... a finding by the circuit administrative judge having administrative authority over the transferor court that ... the transfer will promote the just and efficient conduct of the actions to be consolidated and not unduly inconvenience the parties and witnesses in the actions subject to the proposed transfer; and ... acceptance of the transfer by the circuit administrative judge ... [of] the court to which the actions ... will be transferred.

"[W]here a litigant is faced with a real multiplicity of suits involving the same issues, Rule 2–327(d) furnishes the appropriate avenue for relief." *State v. 91 st St. Joint Venture,* 330 Md. 620, 630–31, 625 A.2d 953 (1993).

At the time of this transfer, several other actions involving these same parties and issues had been submitted to a single judge in the Baltimore City Circuit Court. By September 1999, Chinwuba repeatedly had sought judicial review of actions taken by appellees in connection with PrimeHealth. He asked the Baltimore court to reconsider its decision to finalize the proposed report. In addition, Chinwuba, PrimeHealth, and Goldmark filed separate petitions for judicial review of the final report.

 These Baltimore suits involved the same parties and raised the same or related questions concerning an interwoven set of operative facts, *i.e.,* the actions of the MIA and Larsen

with respect to PrimeHealth. Because the MIA and Larsen cited Chinwuba's actions during the certification process as grounds for their prior actions, all of these suits involved the same critical issue that Chinwuba raised in this action-whether Chinwuba made false or deceptive statements to obtain and maintain certification to operate PrimeHealth as a Maryland HMO. To resolve Chinwuba's claims in this action, the Prince George's court would have had to acquaint itself with a voluminous record that the Baltimore court already had been required to master. In these circumstances, the Prince George's court appropriately exercised its discretion to transfer Chinwuba's newest claims to a court that was actively engaged in resolving claims involving related factual and legal questions. In this respect, the transfer "promote[d] the just and efficient conduct of the actions" and did "not unduly inconvenience the parties and witnesses in" this action. *See* Md. Rule 2–327(d).

We find no merit in either of Chinwuba's grievances about the transfer. His complaint that he was denied his preferred venue, while true, has no persuasive value. Transfers under this rule necessarily cause the plaintiff to lose his or her chosen venue, because such transfers may be made only if venue would have been appropriate in both the transferor court and the transferee court. *See Urquhart v. Simmons,* 339 Md. 1, 19, 660 A.2d 412 (1995). Thus, the rule explicitly authorizes the transferor court to deny the plaintiff his or her choice of venue when it determines that doing so would best serve the interests of justice. *See Odenton Dev. Co. v. Lamy,* 320 Md. 33, 41, 575 A.2d 1235 (1990).

Chinwuba's contention that he would be denied his right to a jury trial is also groundless. Chinwuba does not point to any ruling indicating that the Baltimore court could not or would not give him a jury trial on these claims. If he presented a jury question on any of the issues raised by his complaint, Chinwuba would be entitled to litigate those matters to a Baltimore City jury. The transfer in no way deprived him of a jury trial. He is simply wrong to conclude otherwise.

We turn now to the Baltimore court's reasons for dismissing all of Chinwuba's claims against both the MIA and Larsen.

## II.

### The Trial Court Properly Dismissed Chinwuba's Claims Against The MIA, But Erred In Dismissing All Of His Claims Against Larsen

Chinwuba argues that the trial court erred in dismissing all of his claims against both the MIA and Larsen. In support, he points to a number of separate errors that cumulatively resulted in the improper dismissal of viable claims. We shall address each of these contentions *seriatim.*

### A.

### Chinwuba's Failure To Submit His Claims To The State Treasurer Barred All Of His Claims Against The MIA

█ The first novel question raised in this appeal is whether notice of a claim given to the Attorney General, rather than to the Treasurer, constitutes substantial compliance with the Maryland Tort Claims Act ("MTCA"). *See* Md.Code (1984, 1999 Repl.Vol., 2001 Cum.Supp.), § 12–101 *et seq.* of the State Government Article ("SG"). Chinwuba argues that the definition of substantial compliance is broad enough to encompass notice to the Attorney General in lieu of the State Treasurer. We disagree.

We have described the notice provisions of the MTCA as a "principal condition" of the State's waiver of its sovereign immunity. *See Gardner v. State,* 77 Md.App. 237, 246, 549 A.2d 1171 (1988). To initiate an action under the MTCA, the claimant must "submit[ ] a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim." SG § 12–106(b). "[S]ervice of the complaint and accompanying documents is sufficient only if made on the Treasurer." SG § 12–108(a). The notice requirement, in effect, creates an adminis-

trative condition precedent that claimants must satisfy before they may sue in court. *See Simpson v. Moore,* 323 Md. 215, 223, 225, 592 A.2d 1090 (1991). For this reason, courts have no jurisdiction to entertain claims by claimants who fail to exhaust their administrative remedies before the Treasurer. *See id.*

Chinwuba admits that he did not serve his claim on the Treasurer within the one year limitations period. Instead, he attempts to fit himself within the parameters of cases suggesting that substantial compliance with the MTCA notice requirements can satisfy sections 12–106 and 12–108 of the MTCA.

In *Simpson v. Moore,* the Court of Appeals discussed its decisions concerning an analogous service requirement governing notice of tort claims against counties and municipalities. The *Simpson* Court noted that it had "held that substantial compliance with the notice statute will suffice...." *Id.* at 224, 592 A.2d 1090.

In *Conaway v. State,* 90 Md.App. 234, 600 A.2d 1133 (1992), we relied on the *Simpson* Court's language to hold that in some circumstances, substantial compliance with the notice requirements of the MTCA may suffice. We noted that our holding "is also consistent with § 12–102, which directs that the MTCA is to be 'construed broadly, to ensure that injured parties have a remedy.'" *Id.* at 242 n. 3, 600 A.2d 1133. Applying this standard, we held that a claimant had satisfied the notice requirements of the MTCA even though the claim he submitted to the Treasurer failed to demand a specific amount of damages, as required by section 12–107(a). *See id.* at 250, 600 A.2d 1133.

Since then, the Court of Appeals has acknowledged the viability of a "substantial compliance" argument under the MTCA. In *Condon v. State,* 332 Md. 481, 632 A.2d 753 (1993), the Court approved our definition of substantial compliance as "communication that provides the State 'requisite and timely notice of facts and circumstances giving rise to the claim.'" *Id.* at 497, 632 A.2d 753 (quoting *Conaway,* 90 Md.App. at 246, 600 A.2d 1133).

The doctrine of substantial compliance, however, is not license to ignore the clear mandate of the MTCA. In *Condon*, the Court of Appeals warned that courts may not "infer an intent where the legislature has clearly indicated the contrary." *Id.* Similarly, in *Simpson*, the Court declined to use section 12–202 "as a springboard for judicial legislation" in cases where there is no ambiguity in the statute. *Simpson*, 323 Md. at 227, 592 A.2d 1090. It explained that "[p]rovisions such as this, and the canon of construction favoring a liberal interpretation of remedial legislation, are helpful in resolving ambiguities in statutes, but do not permit us to expand the statute to afford relief where the words of the statute bar that relief." *Id.* We may not " 'judicially place in the statute language which is not there' in order to avoid a harsh result." *Id.* at 225, 592 A.2d 1090 (citation omitted). Thus, "we will not extend or suspend the filing requirements when they are so clear and unambiguous." *Rivera v. Prince George's County Health Dep't*, 102 Md.App. 456, 469–70, 649 A.2d 1212 (1994), *cert. denied*, 338 Md. 117, 656 A.2d 772 (1995).

We find no ambiguity in subsections 12–106(b) and 12–108(a), either when they are considered alone or *in pari materia*. Both subsections unambiguously state that notice of any MTCA claim must be directed and delivered to the Treasurer. In fact, the sole purpose of subsection 12–108(a) is to instruct claimants that the one and only method of satisfying this notice requirement is to serve the claim on the Treasurer. If we were to accept Chinwuba's contention that notice to the Attorney General constitutes substantial compliance with subsections 12–106(b) and 12–108(a), we would be judicially legislating subsection 12–208(a) out of the MTCA. We will not ignore its clear language. "[A] statute should be read so that no part of it is rendered nugatory or superfluous." *Condon*, 332 Md. at 491, 632 A.2d 753. Neither will we "expand the statute to afford relief where the words of the statute bar that relief." *Simpson*, 323 Md. at 227, 592 A.2d 1090.

Our decision not to treat service on the Attorney General as the equivalent of service on the Treasurer reflects practical

and policy considerations. The effect of holding that service on the Attorney General constitutes substantial compliance with the notice requirements of the MTCA would be to allow claimants, *at their option*, to cut the Treasurer out of the statutory equation crafted by the legislature, by electing to serve notice of MTCA claims on the Attorney General rather than the Treasurer.[5] There are cogent reasons not to give claimants this choice. *See Condon*, 332 Md. at 491–94, 632 A.2d 753.

Notice to the Treasurer serves important public purposes. Once notified of a timely tort claim against a State agency, the Treasurer considers the fiscal consequences of the claim, and then decides which of several options to pursue. "The Treasurer may ... (1) consider a claim for money damages under this subtitle or delegate wholly or partly this responsibility to other State personnel; and (2) contract for any support services that are needed to carry out this responsibility properly." SG § 12–107(b). As a result of the early notice required under the MTCA, the Treasurer also has "the opportunity to investigate the claims while the facts are fresh and memories vivid, and, where appropriate, settle them at the earliest possible time." *Haupt v. State*, 340 Md. 462, 470, 667 A.2d 179 (1995). "Unless a contract with a private insurer provides otherwise, the Treasurer or designee may compromise and settle a claim for money damages after the Treasurer or designee consults with the Attorney General." SG § 12–107(c)(2).

█ Only after the Treasurer finally denies the claim may the claimant proceed in court. *See* SG § 12–106(b). In that event, "[u]nless full representation is provided under a contract of insurance, the Attorney General shall defend an action under this subtitle against the State or any of its units." SG § 12–108(b). "[This] procedure allows the State an opportunity to investigate and either settle the claim, or deny the claim

---

5. We note that although section 12–106 specifies that notice must be given to the "Treasurer or a designee of the Treasurer," there is nothing in the record to suggest that the Treasurer has designated that claims should be directed to the Attorney General.

and thereby choose to later defend against the substantive merits of the suit in a traditional judicial forum." *Leppo v. State Highway Admin.*, 330 Md. 416, 428, 624 A.2d 539 (1993).

We reject Chinwuba's suggestion that he "substantially complied" with subsections 12–106(b) and 12–108(a) because the State suffered no prejudice from his notice to the Attorney General rather than the Treasurer. This argument wholly ignores the central role that the legislature gave the Treasurer when it decided to conditionally waive the State's sovereign immunity. Moreover, the Court of Appeals specifically has held that "substantial compliance [with the MTCA] requires more than a mere lack of prejudice to the State." *Johnson v. Maryland State Police*, 331 Md. 285, 292, 628 A.2d 162 (1993).

In any event, it is simply incorrect to say that there is "no prejudice" to the State in these circumstances. Chinwuba speculates that the first and only thing the State Treasurer did upon receiving notice of his claim against the MIA was to call in the Attorney General to handle it. Any assumption that the Treasurer's "review" of his claim would be nothing more than merely assigning legal work to the Attorney General is wrong. As sections 12–106 and 12–107 make clear, it is the Treasurer who, in reviewing a claim, considers the impact of tort liability on the State and its budget. Among other matters, the Treasurer determines whether the State is covered by an insurance program, whether to settle or defend the claim, and whether the claim should be paid from the State Insurance Trust Fund. *See* SG §§ 12–104, 12–107. In contrast, the legislature assigned the Attorney General a more subordinate role—to advise the Treasurer regarding settlements, and to defend against claims not covered by an insurance contract. *See* SG §§ 12–107(c)(2), 12–108(b).

We decline to stretch the substantial compliance doctrine so far that the legislature's unambiguous requirement of notice to the Treasurer becomes meaningless. We hold that the trial court did not err in holding that Chinwuba failed to state a claim against the MIA.

■ Our holding, however, does not extend to Chinwuba's claims against Commissioner Larsen. It appears that the

trial court erroneously dismissed these claims for lack of notice to the Treasurer. We acknowledge that there is a surprising lack of language in our case law directly addressing whether a claimant may assert a tort claim against an individual State employee without notifying the Treasurer in accordance with sections 12–106 and 12–108.[6] What is clear from the case law, however, is that the Court of Appeals has not treated a plaintiff's failure to give notice to the Treasurer as a bar to such a claim against an individual State employee. In *Sawyer v. Humphries,* 322 Md. 247, 587 A.2d 467 (1991), the Court held that plaintiffs who had not named the State as a defendant and had not given the Treasurer notice of their claims against the individual State police officer who allegedly assaulted them, could pursue their tort claims against the officer. *See id.* at 252, 262, 587 A.2d 467.

Accordingly, we must review the trial court's other reasons for dismissing all of Chinwuba's claims against Larsen. As alternate grounds for its judgment, the court held that Larsen had both (1) qualified governmental immunity from tort liability, and (2) an absolute privilege to make all of the allegedly tortious statements about which Chinwuba complained. Chinwuba contests both holdings. In doing so, he raises a second novel issue, concerning whether, by publicly making tortious statements in violation of a specific nondisclosure statute prohibiting such statements, a public official acts outside the scope of his or her public duties, or acts with malice. The answer to this question affects our review of both the governmental immunity and privilege holdings of the trial court. We shall address governmental immunity issues in part II.B and absolute privilege issues in part II.C.

Preliminarily, however, we note that throughout his brief to this Court, Chinwuba mixed the apples of qualified

---

6. We note that Larsen's brief on this issue merely asserts that Chinwuba's failure to comply with sections 12–106 and 12–108 barred the claims "against the Administration." We read this as an implicit concession that the trial court's dismissal of the claims against Larsen on lack of notice grounds was error.

governmental immunity, which bars a wide variety of common law tort claims against state employees, with the oranges of privilege under defamation law, which is a defense only to a reputational tort claim such as defamation[7] or false light invasion of privacy.[8] This confusion is understandable in the context of this case, because both doctrines share an element central to the resolution of this appeal. Governmental immunity shields public employees from tort liability arising from discretionary actions performed without malice, but only if those actions were "within the scope of the public duties of the State personnel." Md.Code (1974, 1998 Repl.Vol.), § 5–522(a)(4)(ii) of the Courts and Judicial Proceedings Article ("CJ").[9] The common law doctrine of privilege under defamation law also gives a defensive shield to certain persons who make certain publications in certain circumstances, but, once again, only if the publications were "made in the performance of [their] official duties." *See Restatement (Second) of Torts ("Restatement")* § 591.

---

7. "[T]o present a prima facie case for defamation, 'a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm.'" *Gohari v. Darvish,* 363 Md. 42, 54, 767 A.2d 321 (2001) (citation omitted).

8. The tort of false light invasion of privacy occurs when
 [o]ne ... gives publicity to a matter concerning another that places the other before the public in a false light ... if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
 *Restatement (Second) of Torts ("Restatement")* § 652E; *see Furman v. Sheppard,* 130 Md.App. 67, 77, 744 A.2d 583 (2000). "It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position. When this is the case and the matter attributed to the plaintiff is defamatory, the rule here stated affords a different remedy, not available in an action for defamation." *Restatement* § 652E at cmt. b.

9. Under Maryland common law, public officials performing discretionary duties in furtherance of their public duties may not be held liable if they act without malice. *See Thomas v. City of Annapolis,* 113 Md.App.

This appeal involves a public official who had both qualified governmental immunity and some privilege to make certain defamatory statements. Chinwuba argues that the trial court erred in holding that Larsen made all of the allegedly improper statements "within the scope of his public duties" and "in the performance of his official duties." We agree with the trial court that the doctrines of governmental immunity and privilege barred claims based on certain of Larsen's "on-the-job" statements. But, for the reasons set forth in section II.B.4 below, we agree with Chinwuba that the trial court erred in concluding that Larsen had governmental immunity and an absolute privilege to make public statements and disclosures that he was statutorily prohibited from making.

## B.

### The Trial Court Erred In Dismissing The Defamation And False Light Claims Against Larsen On Governmental Immunity Grounds

 If a complaint alleges facts sufficient to show that a state official's tortious conduct "either was outside the scope of his 'public duties' or was malicious," then it should survive dismissal on the grounds of governmental immunity. *See Sawyer*, 322 Md. at 253, 587 A.2d 467. In its memorandum opinion, the trial court concluded that Chinwuba's "[c]laims should properly be dismissed" because the allegations in his complaint

---

440, 452, 688 A.2d 448 (1997); *Town of Port Deposit v. Petetit*, 113 Md.App. 401, 412, 688 A.2d 54 (1997). As a result of the MTCA, which limits the State's sovereign immunity on the condition that State employees be afforded a qualified immunity, state employees may be held liable only for "[a]ny tortious act or omission ... that ... is not within the scope of the public duties of the State personnel; or ... is made with malice or gross negligence." *See* Md.Code (1974, 1998 Repl.Vol., 2001 Cum.Supp.), § 5–522(a)(4)(ii) of the Courts and Judicial Proceedings Article ("CJ"); SG § 12–105 ("State personnel shall have the immunity from liability described under § 5–522(b)"); *Simpson*, 323 Md. at 231, 592 A.2d 1090. Because Larsen's duties as Insurance Commissioner make him both a State employee and a public official, we shall refer to his immunity as "governmental immunity."

all relate to the [MIA's] investigation of PrimeHealth and to the Commissioner's petition to place PrimeHealth into receivership, pursuant to the Commissioner's statutory authority. Therefore, *these acts were done within the scope of his public duties.* ... [U]nder [s]ection 2–209, ... the "Commissioner shall make a complete report of each examination made under § 2–205." ... [T]he Commissioner adopted the Report as final on March 8, 1999. As [prescribed] in [s]ection 2–209(f) "if the Commissioner considers it to be in the public interest, the Commissioner may publish an examination report or a summary of it in a newspaper in the State." Therefore, based on the Commissioner's concerns of PrimeHealth as previously stated, *the Commissioner instituted the investigation in good faith and the publication of the report from such investigation is authorized under the Insurance Article.* (Emphasis added and citation omitted.)

The court held that Larsen "[fell] within [s]tatutory and [c]ommon [l]aw [governmental] [i]mmunity...."

Chinwuba argues that Larsen acted outside the scope of his public duties by making statements and disclosures to the press in violation of Insurance Code prohibitions against publicly disclosing preliminary charges arising from the MIA's investigation and examination, before PrimeHealth and Chinwuba had an opportunity to challenge the MIA's findings and to obtain corrections. This argument requires us to examine the nature and scope of the Insurance Commissioner's duties, and then to determine whether Chinwuba adequately alleged that Larsen made public statements or disclosures outside the scope of those duties.

### 1.

### The Insurance Commissioner Has A Statutory Duty Not To Disclose Information Relating To An Investigation And Examination Until The MIA's Report Becomes Final

One of Larsen's duties as Insurance Commissioner is to "examine the affairs, transactions, accounts, records, and as-

sets of each ... authorized health maintenance organization." Md.Code (1995, 1997 Repl.Vol., 2001 Cum.Supp.), § 2–205(a)(1)(v) of the Insurance Article ("Ins."). He must "make a complete report of each examination," and include in that report "only facts ... [discovered] from the books, records, or documents of the person being examined; or ... determined from statements of individuals about the person's affairs." Ins. § 2–209(a),–(b).

Before filing a proposed report regarding an examination, however, the Commissioner must "give a copy of the proposed report to the person that was examined." Ins. § 2–209(c)(1). If the examinee requests a hearing, the Commissioner "may not file a proposed report until after ... the hearing is held[,] and ... any modifications of the report that the Commissioner considers proper are made." Ins. § 2–209(c)(2). Those who are not "examinees," but who are in some way aggrieved by the Commissioner's actions during an investigation or examination also can seek relief, by filing a written demand for a hearing. *See* Ins. § 2–210(a)(2). After the report is finalized, "[i]f the Commissioner considers it to be in the public interest, the Commissioner may publish an examination report or a summary of it in a newspaper in the State." Ins. § 2–209(f).

During the period before the report becomes final, however, there are explicit statutory limits on the type of information that the Commissioner may publicize. Subsection 2–209(g) of the Insurance Article states:

(g) *Disclosure to regulatory or law enforcement agency* ...—(1) Subject to paragraph (2) of this subsection, *the Commissioner may disclose the preliminary examination report, investigation report, or any other matter related to an examination made under § 2–205 ... only to the insurance regulatory agency of another state or to a federal, State, local, or other law enforcement agency.* (2) A disclosure may be made under paragraph (1) of this subsection only if:

(i) the disclosure is made for regulatory, law enforcement, or prosecutorial purposes;

(ii) the agency receiving the disclosure agrees in writing to keep the disclosure confidential and in a manner consistent with this section; and

(iii) the Commissioner is satisfied that the agency will preserve the confidential nature of the information.

(3) Notwithstanding the provisions of this subsection, final reports of examinations are considered public documents and may be disclosed to the public. (Emphasis added.)

 There are important reasons for requiring confidentiality until the MIA completes its investigation and affords aggrieved parties an opportunity to challenge the charges and findings reflected in the MIA's proposed examination report. The Attorney General has recognized that preserving the confidential nature of the contents of a preliminary examination report preserves the right to contest and obtain corrections to a proposed report. *See* 78 Md. Att'y Gen. 233 (1993). On behalf of the MIA, Commissioner Larsen recently explained that the MIA construes subsection 2–209(g) as imposing a duty of confidentiality with respect to any information, findings, and charges that have not been "tested" via the administrative procedures established under subsection 2–209(c). In *Nagy v. Baltimore Life Ins. Co.*, 49 F.Supp.2d 822 (D.Md.1999), *aff'd in part and vacated in part on other grounds*, 2000 WL 718391, 2000 U.S.App. LEXIS 12307 (4th Cir. June 5, 2000), the Commissioner successfully moved to quash a subpoena for documents that would have disclosed particular concerns that the MIA had expressed about a certain insurer before the MIA's examination report became final. *See id.* at 825. Among these documents were letters from an MIA examiner to representatives of the company under examination. The Commissioner argued that disclosing information from the period during which a proposed report remained subject to challenge and correction in an administrative hearing would violate subsection 2–209(g) and "Maryland ... decisional authority." *See id.* at 825. An MIA examiner stated in an affidavit to the federal court that Larsen had authorized him to assert the "privilege" created by subsection 2–209(g). Asserting that under subsection 2–209(g), "the

Commissioner is not permitted to disclose information gained from [an] examination except to other State's insurance regulatory agencies or to law enforcement agencies," he explained that such disclosures chill the MIA's deliberative process, by exposing any disclosures by witnesses, and any changes that the MIA might make during a challenge to its preliminary concerns during the investigation and its preliminary findings in the proposed report.

For this reason, he asserted, it has been MIA's "long standing ... practice to protect the confidential[ity] of all preliminary examination reports and the documents generated during an examination." Under subsection 2–209, "[i]t is also ... regular business practice to revise the proposed report before its issuance upon ... consideration of the facts and legal arguments submitted by the [examinee]."

▮ We give due weight to the Commissioner's interpretation of subsection 2–209(g) as imposing on him a duty of confidentiality in order to preserve the right of aggrieved persons to speak freely to the MIA during its investigation and the period before the report becomes final, so that they might challenge and correct the MIA's findings before the MIA makes public any injurious charges. *See, e.g., Adamson v. Correctional Medical Svcs., Inc.,* 359 Md. 238, 266, 753 A.2d 501 (2000) ("courts give significant weight to the agency's interpretation of the statute that it is required to administer"). We agree with the district court and the Commissioner that the confidentiality requirement of subsection 2–209(g) is designed, *inter alia,* to ensure that the MIA's final report, and its remedial actions, are not tainted by public "grandstanding" before aggrieved persons have had an opportunity to contest and correct the MIA's preliminary findings.

## 2.

## Chinwuba Alleged That Larsen's Public Statements And Disclosures During The Confidentiality Period Were Outside The Scope Of His Public Duties

Chinwuba alleged in the "background" paragraphs of his complaint that before the proposed report became final in

March 1999, "Larsen willfully, maliciously, and blatantly violated the Maryland Insurance Code," by providing the *Washington Post* and the *Baltimore Sun* copies of his March 11, 1998 letter to PrimeHealth's attorneys and PrimeHealth's March 27 reply letter, and also by making "verbal statements regarding his investigation of PrimeHealth and Chinwuba to the media and the public." He also alleged that Larsen improperly "made these . . . . disclosures to the media and public regarding PrimeHealth, and Chinwuba even before communicating those statements to either PrimeHealth or Chinwuba."

Chinwuba incorporated these allegations in his defamation count, and further alleged that:

109. Larsen's verbal and written disclosures to the media and other third parties regarding PrimeHealth and Chinwuba during his investigation were false, derogatory and defamatory statements. These disclosures alleged that Chinwuba provided "false and misleading" testimony to MIA in an effort to obtain a certificate of authority for PrimeHealth from MIA. . . .

113. These statements are defamatory *per se* intending to injure Plaintiff in his profession and employment and his standing in the community, and further impugning him [sic] to be dishonest, fraudulent because these allegations in effect have stated that Chinwuba has provided perjured testimony to MIA.

114. Larsen made these defamatory *per se* statements knowingly and maliciously and with the intent to cause serious damage to PrimeHealth and Chinwuba and for Larsen's own political gain.

115. Larsen made these defamatory *per se* statements out of ill will, hatred, and desire to injure Chinwuba and PrimeHealth and in direct violation of the Maryland Insurance Code.

In his false light count, Chinwuba also alleged that:

119. Larsen, through his unlawful, malicious, and willful conduct in making statements to the media which

were defamatory, disparaging and false regarding Chinwuba and PrimeHealth violated the Maryland Insurance Code and other Maryland law.

120. That based on Larsen's statements, and unlawful written disclosures, several articles were published in the *Washington Post* and *Baltimore Sun* stating that Chinwuba was untrustworthy, unfit to own or manage a HMO in the State of Maryland, and that he provided false testimony to the MIA to obtain a certificate of authority for PrimeHealth....

122. Larsen improperly and unlawfully publicized facts about Chinwuba, which placed Chinwuba in a false light by attributing to him conduct, and characteristics, which were false.

123. Larsen knew that the facts published about the Plaintiff were false, or published them with a reckless disregard for the truth of those facts.

In this Court, Chinwuba contends that the trial court erred in dismissing his defamation and false light counts on the grounds that Larsen enjoyed governmental immunity. "[Al-though [Larsen] may be within the scope of his statutory authority to conduct an investigation, he is ... not within the scope of his statutory authority to discuss the content or findings of his investigation to the public and the media before the investigative report is finalized[.]" Before we address Chinwuba's argument, however, we first must resolve a threshold factual question that Larsen belatedly raised during oral argument in this appeal.

3.

## Larsen Did Not Establish As A Matter Of Law That He Made The Challenged Statements And Disclosures Before The Confidentiality Period Began

At oral argument, Larsen's counsel defended the trial court's favorable decision on the grounds that any challenged statements and disclosures to the press had been made *before* the confidentiality period under subsection 2–209(g) began.

In support of this contention, he argued for the first time that the MIA's investigation did not begin until April 6, 1998, when the MIA arrived at PrimeHealth's business premises for an on-site examination.

Larsen's counsel acknowledged that this argument directly contradicts previous statements by the MIA and Larsen in this and other courts, *i.e.*, that the MIA began to investigate in March 1998, but asserted that these statements had been incorrect. In support, he pointed to an April 3, 1998 letter stating that the MIA would arrive at PrimeHealth's business premises on April 6 to examine PrimeHealth's records.

Given the surprise nature of Larsen's new argument, we permitted Chinwuba to file a supplemental brief addressing it. Chinwuba offers several reasons for rejecting Larsen's contention that the statements and disclosures reflected in the articles did not violate subsection 2–209(g). We find them persuasive.

First, we agree with Chinwuba that, by themselves, paragraphs 41–45 of his complaint are sufficient to allege that the investigation and examination began in March rather than April. Second, we also agree that Larsen's March 11 letter, PrimeHealth's March 27 response letter, and the newspaper articles, all of which were attached to the complaint, provide ample evidence from which a fact finder could infer that the investigation and confidentiality period had begun by the time Larsen sent his March 11 letter to PrimeHealth. Finally, we agree that Larsen may be judicially estopped from denying that the investigation began after March.[10] *See Roane v.*

---

10. We shall not resolve this latter issue. We note for the record, however, that the MIA and Larsen obtained relief in prior judicial proceedings during which they represented that the MIA investigation began in March. In our August 30, 2000 opinion regarding Prime-Health's challenge to the MIA's final report, we stated that "[i]n March of 1998, ... Larsen directed the [MIA] to conduct an examination of PrimeHealth's financial health." In the transfer of venue hearing, Larsen stated that "the Administration initiated an investigation of PrimeHealth in March of 1998. This investigation was initiated pursuant to the Commissioner's authority to examine the conduct of various insurers." In the hearing on the motion to dismiss this action, Larsen

*Washington County Hosp.,* 137 Md.App. 582, 592–93, 769 A.2d 263, *cert. denied,* 364 Md. 463, 773 A.2d 514 (2001).

It is sufficient for purposes of this appeal to conclude that there is an unresolved factual dispute on this question. Accordingly, we decline to adopt Larsen's belated amendment to his previous factual assertions as a reason to affirm the trial court's decision. Because we are required to view the allegations and evidence in the light most favorable to Chinwuba, we assume that the MIA began to investigate and examine Prime-Health and Chinwuba on or before March 11, 1998. Similarly, we must assume for the purposes of our review that Larsen violated his statutory duty of confidentiality, by making public statements that also defamed Chinwuba and placed him in a false light. Applying these assumptions, we now turn to the trial court's conclusion that Larsen was entitled to judgment on governmental immunity grounds.

4.

## Larsen Did Not Establish As A Matter Of Law That He Made The Challenged Statements And Disclosures Within The Scope Of His Public Duties

The trial court dismissed Chinwuba's claims on the ground that Larsen was acting within his statutory authority when he decided to initiate an investigation of PrimeHealth, and to publish the final report. We agree that Larsen had the statutory authority to take these actions, that Larsen was acting within the scope of his public duties when he did so, and that he has governmental immunity against any claim arising from these official acts. But in focusing on the decisions to investigate and to publish the final report, the trial court overlooked Chinwuba's specific complaint about Larsen's allegedly defamatory publications during the confidentiality period. Thus, the court did not decide whether Larsen could use

---

more specifically stated that "[o]n March 11th, 1998, the Commissioner wrote to PrimeHealth stating that PrimeHealth is under investigation and stating the bases for the investigation." The trial court's opinion also stated that the MIA began to investigate and examine PrimeHealth in March 1998.

the protective cloak of governmental immunity for claims based on tortious statements that Larsen allegedly made to the press during a period he was statutorily prohibited from doing so.

First, we address whether Larsen's statements and disclosures during the confidentiality period were within the scope of his public duties. In *Sawyer v. Humphries,* the Court of Appeals held that the phrase " 'scope of the public duties' in the [Maryland] Tort Claims Act is coextensive with the common law concept of 'scope of employment' under the doctrine of respondeat superior...." *Sawyer,* 322 Md. at 254, 587 A.2d 467. The Court explained that

> **[t]he general test ... for determining if an employee's tortious acts were within the scope of his employment is whether they were in furtherance of the employer's business and were "authorized" by the employer....** " 'By authorized is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders.' " ... **"To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized."** ... [A]n important factor is whether the employee's conduct was "expectable" or "foreseeable." ... [P]articularly in cases involving intentional torts committed by an employee, this Court has emphasized that where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours ..., the employee's actions are outside the scope of his employment.... "Where the conduct of the servant is unprovoked, highly unusual, and quite outrageous," courts tend to hold "that this in itself is sufficient to indicate that the motive was a purely personal one" and the conduct outside the scope of employment.
>
> *Id.* at 255–57, 592 A.2d 1098 (citations omitted)(emphasis added).

■ In subsequent decisions, the Court has summarized "the overall test" as "whether the tortious acts were done by the [employee] in furtherance of the employer's business and were such as may fairly be said to have been authorized by him." *Ennis v. Crenca,* 322 Md. 285, 293–94, 587 A.2d 485 (1991)(quotation marks and citations omitted); *see Tall v. Bd. of Sch. Comm'rs,* 120 Md.App. 236, 252–53, 706 A.2d 659 (1998). Among the factors to be considered in determining whether a particular tortious act was within the scope of public duties are "whether or not the master has reason to expect that such an act will be done," "the similarity in quality of the act done to the act authorized," "the extent of departure from the normal method of accomplishing an authorized result," and "whether or not the act is seriously criminal." *Sawyer,* 322 Md. at 257, 587 A.2d 467 (quotation marks and citations omitted).

■ When the allegations of a complaint raise competing factual inferences, "the question of whether or not the defendant's actions were within the scope of his employment should not be decided on a motion to dismiss." *See id.* at 261, 587 A.2d 467; *see also Cox v. Prince George's County,* 296 Md. 162, 170–71, 460 A.2d 1038 (1983)(scope of employment issue was for the jury and should not have been resolved by sustaining a demurrer). But to ensure that the benefit of governmental immunity is realized as early as possible in the litigation process, courts have placed a higher pleading burden on claimants seeking to avoid the bar of governmental immunity. To overcome a motion raising governmental immunity, a plaintiff must allege with clarity and precision those facts which make the act fall "outside the scope of the public employment." *See Manders v. Brown,* 101 Md.App. 191, 216–17, 643 A.2d 931, *cert. denied,* 336 Md. 592, 650 A.2d 238 (1994). "Magic words" that are not supported by specific facts will not suffice. *See Green v. Brooks,* 125 Md.App. 349, 377, 725 A.2d 596 (1999).

■ For this reason, merely alleging that a public employee's tortious act was unauthorized is not sufficient to defeat a motion raising a governmental immunity defense.

*See id.* " 'An act may be within the scope of employment, even though forbidden or done in a forbidden manner, or consciously criminal or tortious....' " *Tall,* 120 Md.App. at 252, 706 A.2d 659 (citation omitted). "An employee's unauthorized conduct might fall within the scope of employment if it was of the same general nature as conduct that was authorized or incidental to that conduct." *Id.* at 253, 706 A.2d 659 (citing *Sawyer,* 322 Md. at 256, 587 A.2d 467). Specifically, it is not enough to allege that a public employee disobeyed directions, because he or she may have done so as a result of the very type of negligence that governmental immunity was designed to cover.

Accordingly, when a plaintiff such as Chinwuba contends that the particular conduct about which he complains was unauthorized, he must allege specific facts raising an inference that the public employee knew that his conduct was unauthorized. Here, Chinwuba has done so. He alleged that these press contacts were actually prohibited by a statute that directly instructs Larsen, as Commissioner of the MIA, to refrain from making public statements about "matter[s] related to an examination" before the report of an investigation or examination becomes final. *See* Ins. § 2–209(g). Citing the Commissioner's interpretation of subsection 2–209(g) in the *Nagy* case, he also alleged facts sufficient to raise an inference that Larsen had actual knowledge of his duty of confidentiality under this statute. We must accept that inference as true for purposes of our review. The question, then, is whether Chinwuba's allegation that Larsen knowingly violated subsection 2–209(g) was sufficient to allege that Larsen was not acting within the scope of his public duties when he made the challenged statements and disclosures to the press.

### a.

### Larsen Did Not Negate The Inference That His Public Statements During The Confidentiality Period Were Outside The Scope Of His Public Duties

We have recognized that in some circumstances, when a public official acts in knowing violation of a public law that he

or she had a duty to obey, an inference may be drawn that the official had either a personal motive or was "departing" from the employer's business. In *Tall,* we held that allegations a teacher used corporal punishment in violation of a statutory prohibition against such punishment raised an inference that the teacher was not acting in furtherance of the school board's purpose. *Tall,* 120 Md.App. at 260, 706 A.2d 659. In *Manders,* we held that allegations that city council members modified a land urban renewal plan in violation of an open meetings statute raised an inference that they were acting for their own political and social benefit. *See Manders,* 101 Md.App. at 218, 643 A.2d 931. In both cases, we held that the challenged conduct was outside the scope of the public duties entrusted to these officials.

But in these and other cases in which we have held as a matter of law that the public official's conduct was not within the scope of the public employment, the egregious or personal nature of the misconduct precluded any other inference. *See, e.g., Wolfe v. Anne Arundel County,* 135 Md.App. 1, 12–15, 761 A.2d 935 (2000), *cert. granted,* 363 Md. 205, 768 A.2d 54 (2001) (affirming summary judgment in favor of county employer based on actions of police officer who raped motorist after a traffic stop, because officer did not act within the scope of employment); *Tall,* 120 Md.App. at 260, 706 A.2d 659 (affirming dismissal of respondeat superior claim against school board based on actions of teacher who physically disciplined a child with Down's Syndrome for urinating in his pants, leaving raised welts and bruises on student's arms and legs, because teacher did not act "in furtherance of the Board's objective of educating disabled children"); *Manders,* 101 Md.App. at 218, 643 A.2d 931 (reversing dismissal of claims against city council members who secretly changed land use plan, because they did so to obtain political and social favor from those who benefitted). In such cases, the fact that the employee's conduct also violated a statutory prohibition was only one of several factors supporting an "outside the scope" inference.

The tortious statements and disclosures at issue in this case are not so easily characterized as "outside the scope" of

Larsen's public duties. On one hand, Larsen's statements and disclosures were not criminal, they were clearly related to his public duties, and they arguably were "in furtherance" of the MIA's legitimate examination and "incidental" to the performance of duties entrusted to Larsen, "even though in opposition to ... express and positive orders." *See Sawyer,* 322 Md. at 255, 587 A.2d 467. Indeed, if Larsen had made these same statements and disclosures to the press after the examination report became final, the only inference we reasonably could draw would be that he did so in the performance of his public duties. *See* Ins. § 2–209(f).

On the other hand, given the explicit statutory prohibition against public statements and disclosures during the confidentiality period, Larsen's press contacts arguably were, in the parlance of the *Sawyer* test, neither "expectable," "foreseeable," nor "of the same general nature as" the type of public disclosures that he was authorized to make. *See Sawyer,* 322 Md. at 255, 587 A.2d 467. We are in no position, from the appellate bench, to assess whether these contacts were "highly unusual" from a historical perspective, but we think the language and purpose of subsection 2–209(g), as well as the Commissioner's prior interpretation of it, suggest that such contacts are "highly unusual."

Given the competing factual inferences regarding whether Larsen's public statements during the confidentiality period were within the scope of his public duties, we could rest our decision to vacate the trial court's judgment on the defamation and false light counts solely on the existence of a factual dispute as to whether Larsen acted within the scope of his public duties when he made press contacts during the confidentiality period. But we cannot so easily ignore the mandate of subsection 2–209(g). Accordingly, we turn next to Chinwuba's contention that the trial court erred in not holding as a matter of law that Larsen acted outside the scope of his public duties. We shall hold that, if Larsen did make statements to the press that he knew were subject to the confidentiality requirements of subsection 2–209(g), then as a matter of law, he did not do so in the performance of his public duties.

**b.**

## Public Statements Made In Violation Of Ins. § 2–209(g) Are Not Within The Scope Of The Commissioner's Public Duties

Chinwuba argues that allowing a fact finder to conclude that Larsen acted within the scope of his public duties when he made improper statements and disclosures to the press in violation of subsection 2–209(g) would defeat the purpose of that subsection. He asserts that the legislature imposed the confidentiality requirement in order to ensure a full, adversarial determination of relevant facts *before the MIA speaks publicly about the substance of any concerns resulting from an investigation or examination.* If the Commissioner can make defamatory statements during the confidentiality period, without consequence, he contends, then the strict limitations on disclosure enumerated in subsection 2–209(g) will become meaningless words on a page.

Except for the *Nagy* case, there is no reported case law construing subsection 2–209(g). The parties did not point us to any Maryland cases addressing whether a public official stepped outside the scope of his public duties by violating a comparable nondisclosure statute. The only reported Maryland case considering whether a public official's allegedly defamatory statements to the press were made outside the scope of that official's public duties involved a city council member who told a newspaper reporter about an alleged bribe. In *Ennis v. Crenca,* 322 Md. 285, 587 A.2d 485 (1991), the Court of Appeals held that the council member who reported the alleged bribe 76 days after it took place, and long after the vote to which it allegedly related, did not make the allegedly defamatory report within the scope of her public duties. *See id.* at 294–95, 587 A.2d 485. The *Ennis* Court concluded that the council member's report directly to the press, instead of to "an appropriate government official," could not be characterized as "incidental to [her] employment as a local elected legislative official." *Id.* at 295 & n. 6, 587 A.2d 485.

In doing so, the Court specifically rejected a claim that "the public derived some benefit from learning that one of its elected officials was allegedly offered a bribe," because "there is nothing peculiar to [the council member's] job as a city council member which created that benefit." *Id.* at 295, 587 A.2d 485. The Court explained that, although "under some circumstances, an elected official may be acting within the scope of his or her employment when making statements to the press," the official cannot claim to be performing public duties by making false and defamatory statements to the press for his or her own purposes. *See id.* at 296, 587 A.2d 485.

 We find the latter observation generally instructive, but recognize that *Ennis* differs from this case. As the Court of Appeals noted, the substance of those press comments did not directly concern the defendant's public duties, and were not subject to a nondisclosure statute. Here, Larsen's alleged press contacts undisputedly concerned matters regarding an investigation and examination that was undertaken pursuant to his duties as Insurance Commissioner. The question is whether these comments were outside the scope of Larsen's public duties *because* they were specifically prohibited by subsection 2–209(g).

In support of his contention that they were, Chinwuba cites *Manders v. Brown.* In that case, we reviewed the plaintiff's allegations that Crisfield city council members knowingly violated a statutory public meeting requirement in order to secretly approve a project that allegedly advanced their political careers and social status in the community, by approving a land use plan that favored owners of crab houses located in that area. We held that these allegations were sufficient to avoid dismissal on the grounds of governmental immunity. *See Manders,* 101 Md.App. at 203, 218, 643 A.2d 931.

But we again find distinguishing features in that case. Unlike Chinwuba, Manders did not rely solely on the defendants' alleged statutory violations to establish that the defendants acted outside the scope of their public duties. Manders

pleaded specific facts to support his allegation that the defendants were acting for political and social gain. He identified the persons and projects that the defendants allegedly favored. He explained that these persons had substantial influence in the community. These details provided specific factual support for his contention that the defendants had a self-interested motive for violating the statute.

In contrast, Chinwuba has not offered any similarly specific factual allegations to support his broad suggestion that Larsen had a personal motive for violating subsection 2–209(g). Although he alleged that Larsen did so for "political gain" or as a result of "racism," those allegations are nothing more than bare and conclusory labels. He has not alleged any comparably detailed facts that might arguably support these accusations.

We think the lack of any "outside the scope of public duty" allegation, other than the statutory violation, makes this case significantly different from *Ennis* and *Manders*. We perceive the question raised by Chinwuba's argument that Larsen acted outside the scope of his public duties as a novel, but very narrow, one. Would Larsen's violation of subsection 2–209(g), *by itself,* be grounds to hold as a matter of law that Larsen acted outside the scope of his public duties in making improper press statements and disclosures? Searching outside this jurisdiction, we found an instructive case addressing the violation of a similarly specific nondisclosure law. In *Elder v. Anderson*, 205 Cal.App.2d 326, 23 Cal.Rptr. 48 (1962), the trustees of a school district mailed to many households a special announcement of a public meeting to discuss " 'the serious violation of manners, morals and discipline that occurred ... as the direct result of interference by the Elder and Fries boys who are now suspended from school.' " *Id.* at 49. Mrs. Elder filed a libel claim on behalf of her son, alleging that the trustees had violated a state law prohibiting school officials from "giv[ing] out any personal information concerning any particular minor pupil," except as specifically permitted to parents and certain public officials. Recognizing that "the case before us may be an important one to all public

officials[,]" the *Elder* Court held that the trustees could not claim governmental immunity. *See id.* at 52.

In doing so, the court acknowledged the importance of governmental immunity. "To subject citizens serving as public officers to suit and trial in every instance in which their good faith but mistaken actions caused injury to another 'would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.'" *Id.* at 53 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949) (Learned Hand, J.)). Nevertheless, the court held that the trustees were not entitled to claim immunity for actions that had been prohibited by statute. It explained that, although the trustees were statutorily authorized to hold an executive session in order to consider disciplinary problems, they could do so "only when it would not violate [the statute] . . . prohibit[ing] the school trustees from giving out personal information concerning a pupil." *Id.* at 54. Considering the specific nature of the nondisclosure statute, the court concluded that "we find [this public statement] more than a good faith mistaken action. In this case [the] trustees violated a code section prohibiting dissemination of personal information concerning pupils, and thus stepped outside the protection of their office." *Id.* at 53.[11]

We find the *Elder* Court's decision and rationale persuasive in view of the unusually specific confidentiality instructions in subsection 2–209(g). Like the statute in *Elder*, subsection 2–209(g) embodies not only clear legislative policy, but also clear

---

**11.** The California Supreme Court relied on *Elder* in holding that a public entity does not have governmental immunity under California law when it violates a "hard and fast rule" set forth in a legislative enactment that the public entity has a mandatory duty to obey. *See Ramos v. County of Madera*, 4 Cal.3d 685, 94 Cal.Rptr. 421, 484 P.2d 93, 100–01 & n. 11 (1971). It also has recognized that an allegation that a public official violated a specific nondisclosure statute would constitute a "tenable contention" that the publication was not within the scope of his or her public duties. *See, e.g., Kilgore v. Younger*, 30 Cal.3d 770, 180 Cal.Rptr. 657, 640 P.2d 793, 799 (1982)(failure to plead illegal dissemination of confidential information barred claim against attorney general).

directives. Although we also have serious concerns about the negative effects of subjecting public officials to suits arising from public statements concerning their official actions, we conclude that this case involves a narrowly defined circumstance in which a public official may be held personally accountable for alleged defamatory public statements made in violation of a confidentiality statute that specifically prohibits the type of public statements that gave rise to these claims.

Here, Chinwuba alleged that Larsen knowingly made prohibited and tortious statements to the press in violation of a statute he was responsible for executing. We find it significant that the nondisclosure instructions in subsection 2–209(g) are specifically directed to "the Commissioner" of the MIA. It broadly covers disclosures of "a preliminary examination report, investigation report, *or any other matter related to an examination made under § 2–205[.]*" Ins. § 2–209(g)(1)(emphasis added). It strictly limits disclosure of such information to an exclusive list of public agencies concerned with insurance regulation and law enforcement. *See* Ins. § 2–209(g)(1)(2). Even then, it prescribes that disclosures may be made to such agencies only "for regulatory, law enforcement, or prosecutorial purposes," and only if "the agency receiving the disclosure agrees in writing to keep the disclosure confidential" and "the Commissioner is satisfied that the agency will preserve the confidential nature of the information." Ins. § 2–209(2)(i)–(iii). In these circumstances, if the Commissioner elects to make public statements that are prohibited by subsection 2–209(g), then he or she does so outside the protection of his or her public office, and at the risk that he or she may be held accountable for any tortious statements.

Our conclusion that, as a matter of law, disclosures in violation of subsection 2–209(g) cannot be made "in the performance of the Commissioner's public duties" is bolstered by the history of subsection 2–209(g). Before subsection (g) was added, the Commissioner had broad discretion to publicly disseminate information relating to an ongoing examination at any time before the final examination report was filed, if he or she determined that doing so was in the best interests of the

public. *See* former Md.Code (1957, 1994 Repl.Vol.), Art. 48A, § 34(4) ("The Commissioner . . . may at any time testify and offer other proper evidence as to information secured during the course of an examination, whether or not a written report of the examination has at that time been either made, served, or filed in the Commissioner's office"); *id.* at § 34(5) ("Commissioner may withhold from public inspection any examination or investigation report for so long as he deems the withholding to be necessary for the protection of the person examined against unwarranted injury or to be in the public interest"); 78 Op. Att'y Gen. 233, *4 (1993) ("Nothing in this statute prevents the Commissioner from making . . . a preliminary examination report public at any time"). In practice, however, the Commissioner historically did not publish preliminary reports, "in order to protect the examined company from unfair publicity should the [MIA] determine that the preliminary report is incorrect and requires amendment." 78 Op. Att'y Gen. 223, at *4.

In 1994, the legislature amended section 2–209 to add the nondisclosure provisions of subsection (g). *See* 1994 Md. Laws, Chap. 551, § 1. The purpose of severely restricting disclosure of information related to an ongoing investigation or examination is apparent in the language of both the old and the new disclosure provisions. Even before subsection (g) was added, this statute required the Commissioner to exercise discretion in a manner that avoided "unwarranted injury" to those affected by an MIA investigation. *See* former Art. 48A, § 34(5). In practice, the Commissioner adopted a policy of not disclosing proposed reports in order to prevent the disclosure of harmful, but untested findings. *See* 78 Op. Att'y Gen. 233, *4. The addition of subsection (g) elevated this concern about the damaging effects of premature charges by the MIA, by explicitly removing any discretion the Commissioner previously might have exercised to make disclosures while the proposed report was being litigated to finality. By preventing public disclosure of preliminary information, the legislature made it less likely that the MIA will become "entrenched" in a

viewpoint that has not been adversarily tested via the procedural protections specified in subsection 2–209.

For the benefit of the public and those aggrieved by the MIA's actions, the legislature imposed what, in effect, is a "gag rule" that has only a few narrowly defined exceptions. None of these exceptions permit the Commissioner to provide the press with confidential correspondence to and from insurers concerning the substance of an ongoing MIA investigation and examination.

Chinwuba alleges that, at the time Larsen made the statements and disclosures at issue here, he fully understood he was responsible for preserving the right to contest and obtain modifications to the MIA's preliminary findings, by preventing public disclosure of such matters lest they have a chilling effect on the deliberative process. *See Nagy*, 49 F.Supp.2d at 826. We conclude that Chinwuba adequately alleged specific facts that raised a factual dispute about whether Larsen made tortious statements to the press and whether he did so during the confidentiality period he knew had been established by subsection 2–209(g). We hold that if a fact finder concludes that Larsen knowingly made prohibited statements and disclosures during the confidentiality period, then, as a matter of law, Larsen acted outside the scope of his public duties and cannot claim the cloak of governmental immunity in any tort claim based on such impermissible publications.

### 5.

### Chinwuba Has Not Alleged Facts Sufficient To Raise An Inference Of Malice

As alternative grounds for reversing the trial court's ruling that his claims are barred by governmental immunity, Chinwuba argues that "whether [Larsen] acted with malice when he acted deliberately against the express dictates of the statute is a question for the jury to decide." [12] Chinwuba

---

12. The trial court did not address whether Larsen's allegedly improper disclosures to the press could be evidence that Larsen was grossly

contends that just as an "outside the scope of duty" inference can be drawn from his allegations that Larsen violated the nondisclosure provisions of subsection 2–209(g), so too can a "malice" inference be drawn from the same allegations.

In focusing solely on the question of whether Larsen was acting within the scope of his public duties when he made the allegedly tortious public statements about Chinwuba, the trial court did not directly address whether a violation of subsection 2–209(g), standing by itself, is sufficient to allege malice. The court's decision, however, is an implicit rejection of such an argument.

 Chinwuba is correct in asserting that even if Larsen was acting within the scope of his public duties when he made the alleged disclosures, he still might have been acting with malice sufficient to defeat his qualified immunity. *See Sawyer,* 322 Md. at 262, 587 A.2d 467. State officials who commit torts within the scope of their public duties do not have governmental immunity if they act with malice. *See* CJ § 5–522(b); *Thomas v. City of Annapolis,* 113 Md.App. 440, 456, 688 A.2d 448 (1997). The Court of Appeals has held that there is no "reason why a public official should not be held responsible for his malicious actions even though he claims they were done within the scope of his discretionary authority." *Robinson v. Bd. of County Comm'rs,* 262 Md. 342, 348, 278 A.2d 71 (1971); *see also Thomas,* 113 Md.App. at 456, 688 A.2d 448 ("common law public official immunity is not available with respect to deliberate acts that form the basis for intentional torts or acts committed with actual malice").

 "Malice may be inferred from the surrounding circumstances." *Green v. Brooks,* 125 Md.App. 349, 377, 725 A.2d 596 (1999). Thus,

---

negligent, and therefore, not protected by the qualified governmental immunity for state employees under the MTCA. Chinwuba has not raised any issues with respect to a gross negligence theory against Larsen. We will not address this issue, because Chinwuba and the trial court did not. See *Lovelace v. Anderson,* 366 Md. 690, 695–96, 785 A.2d 726, 2001 Md. LEXIS 933, *3–4 (2001).

[t]he question raised for purposes of immunity under the State Tort Claims Act is whether a jury could reasonably find that petitioners' conduct, given all of the existing and antecedent circumstances, was motivated by ill will, by an improper motive, or by an affirmative intent to injure.... [T]hat motive or animus may exist even when the conduct is objectively reasonable. If it does, there is no immunity under the State Tort Claims Act.

*Shoemaker v. Smith*, 353 Md. 143, 164, 725 A.2d 549 (1999).

 Whether a complainant has sufficiently alleged malice is a question of law. *See id.* at 167, 725 A.2d 549. In making that determination, courts must draw all inferences regarding credibility and factual disputes in favor of the plaintiff. *See Porterfield v. Mascari II, Inc.*, 142 Md.App. 134, 137–38, 788 A.2d 242, 2002 Md.App. LEXIS 2, *4–5 (2002). We recognize that "[b]ecause the determination of malice, in particular, involves findings as to the defendant's intent and state of mind, there is much less likelihood of it presenting an 'abstract issue of law.'" *Shoemaker*, 353 Md. at 168, 725 A.2d 549. Nevertheless, to defeat a motion based on governmental immunity, a plaintiff must point to facts sufficient to raise an inference of malice. "[T]he plaintiff 'must allege with some clarity and precision those facts which make the act malicious.'" *Green*, 125 Md.App. at 377, 725 A.2d 596 (quoting *Elliott v. Kupferman*, 58 Md.App. 510, 528, 473 A.2d 960 (1984)).

[P]laintiffs may not rely upon the mere existence of such an intent, motive, or state of mind issue.... Because a defendant's subjective intent is an element of the plaintiff's claim, the plaintiff must point to specific evidence that raises an inference that the defendant's actions were improperly motivated in order to defeat the motion. That evidence must be sufficient to support a reasonable inference of ill will or improper motive.

*Thacker v. City of Hyattsville*, 135 Md.App. 268, 301, 762 A.2d 172 (2000), *cert. denied*, 363 Md. 206, 768 A.2d 55 (2001).

We have considered whether allegations were sufficient to raise an inference of a racial or personal animus in various situations. In *Nelson v. Kenny*, 121 Md.App. 482, 494–95, 710 A.2d 345 (1998), we reversed summary judgment in favor of an arresting officer because there was evidence supporting an inference that she intentionally humiliated and embarrassed the plaintiff out of racial animosity toward the plaintiff. In *Leese v. Baltimore County*, 64 Md.App. 442, 480, 497 A.2d 159, *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985), we reversed the dismissal of a county employee's complaint against his supervisors because he adequately alleged that they wrongfully terminated him in order to satisfy that animosity and harm the plaintiff. In *Thacker v. City of Hyattsville*, 135 Md.App. at 308–09, 762 A.2d 172, we reversed summary judgment because there was sufficient evidence to support an inference that the officer made a decision to arrest out of racial, personal, or financial animosity toward the plaintiff.

But we also have rejected attempts to rely on bare allegations that a particular act raises an inference of malice. *See, e.g., Baltimore Police Dep't v. Cherkes*, 140 Md.App. 282, 330–31, 780 A.2d 410 (2001) (bare allegation of malice not sufficient to avoid dismissal of claims arising from training of police officers who allegedly assaulted plaintiff); *Tavakoli–Nouri v. State*, 139 Md.App. 716, 730 n. 2, 779 A.2d 992 (2001)(bare allegation of national origin discriminations did not state claim for violation of constitutional rights); *Green*, 125 Md.App. at 380, 725 A.2d 596 (bare allegation of malice not sufficient to avoid dismissal of claim arising from arrest resulting from mistaken identity); *Penhollow v. Bd. of Comm'rs*, 116 Md. App. 265, 294–95, 695 A.2d 1268 (1997)(bare allegation of gender bias not sufficient to avoid judgment on discrimination claim); *Williams v. Prince George's County*, 112 Md.App. 526, 551, 685 A.2d 884 (1996) (bare allegation of malice not sufficient to avoid judgment on claim arising from wrongful arrest).

In this case, Chinwuba argues that his allegations are sufficient to state a claim that Larsen deliberately made

tortious public statements in order to humiliate or harm Chinwuba, or to benefit his own political career or reputation. We do not agree. By itself, we do not view the bare allegation that Larsen violated subsection 2–209(g) as "specific evidence .... sufficient to support a reasonable inference of ill will or improper motive." *Thacker*, 135 Md.App. at 301, 762 A.2d 172. Chinwuba's allegation that Larsen made these improper statements for "political gain" did not relate specifically to the potentially actionable statements made during the confidentiality period. Moreover, as we have already discussed, Chinwuba did not allege or point to any specific facts that would support his bald allegations of personal animus, political gain, or racial bias. *Cf. Thacker*, 135 Md.App. at 305–06, 762 A.2d 172 (arresting officer made allegedly racial comment and had expressed dislike of arrestee); *Nelson*, 121 Md.App. at 494–95, 710 A.2d 345 (arresting officer responded favorably to overtly racial complaint); *Manders*, 101 Md.App. at 218, 643 A.2d 931 (council members allegedly sought to curry political and social favor of influential business owners in community). It appears that these allegations are simply Chinwuba's "conjecture based on his characterization." *See Tavakoli–Nouri*, 139 Md. App. at 730 n. 2, 779 A.2d 992. Bald assertions and conclusory statements regarding an unsavory motive, unsupported by any specific factual detail, are not sufficient to raise an inference of malice, or to withstand a motion to dismiss. *See Green*, 125 Md.App. at 380, 725 A.2d 596.

## C.

### The Trial Court Erred In Holding That Any Public Statements Made By Larsen In Violation Of Subsection 2–209(g) Were Absolutely Privileged

The trial court also held that any wrongful statements or disclosures that Larsen may have made were protected by an absolute privilege covering the head of a State agency. Chinwuba challenges this holding on two different grounds. We address each separately, finding merit in both.

1.

## Larsen Does Not Have An Absolute Privilege To Make Defamatory Statements Outside The Performance Of His Public Duties

The trial court dismissed Chinwuba's defamation and false light counts because Larsen, "as 'head of a state department,' acting as the Maryland Insurance Commissioner, is entitled to [an] absolute privilege." [13] In doing so, the trial court adopted a tort law doctrine recognized in the *Restatement (Second) of Torts,* which provides that even defamatory statements made by a "governor or other superior executive officer of a state" are absolutely privileged if the defamatory communication is "made in the performance of his [or her] official duties." *See Restatement* § 591(b). The *Restatement* states that this absolute privilege extends to "the heads of state departments[.]" *Id.* at cmt. c.

"An absolute privilege is one which provides complete immunity and applies ... 'principally to (1) judicial proceedings; (2) legislative proceedings; (3) in some cases to executive publications; (4) publications consented to; (5) publications between spouses; and (6) publications required by law.'" *Gohari,* 363 Md. at 55 n. 13, 767 A.2d 321 (citation omitted). The Court of Appeals recently explained that "the difference between an absolute privilege and a qualified [or conditional] privilege is that 'the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused.'" *Id.* (citation omitted).

In the trial court, Chinwuba asserted that Larsen did not have an absolute privilege to make defamatory statements to the press in violation of subsection 2–209(g), because those

---

**13.** The same absolute and conditional privilege defenses against defamation are also available as defenses to false light claims. *See Restatement* § 652G.

communications were not "made in the performance of his official duties." In this Court, he renews that argument.

 We agree that the same factual dispute that precluded judgment on the governmental immunity issue also precludes judgment on privilege grounds.

The absolute privilege ... exists only when the officer ... publishes the defamatory matter **in the performance of his official duties, or within the scope of his line of duty. ... It is enough that the publication is one that the officer is authorized to make in his capacity as an officer.** Thus the head of a ... state department may be authorized to issue press releases giving the public information concerning the conduct of the department, or events of public interest that have occurred in connection with it; and **if he is so authorized he is within the scope of his official duties when he gives the information to the press.**

*Restatement* § 591 cmt. f.

In *Walker v. D'Alesandro*, 212 Md. 163, 170, 129 A.2d 148 (1957), the Court of Appeals held that the scope of an executive official's absolute privilege should not be extended by an unduly broad concept of his or her official duties. Without deciding whether the mayor of Baltimore had an absolute privilege, the Court concluded that his decision to remove a particular painting from a public gallery was not within the scope of his public duties. Noting that "[n]o State law or City ordinance authorizing the exercise of powers of censorship by the Mayor and the removal of pictures which he may deem objectionable has been cited to us," the Court explained why the mayor could not assert an absolute privilege. *Id.* at 172, 129 A.2d 148.

[E]ven if the picture were objectionable, we do not regard the censorship by the Mayor of pictures publicly exhibited in a City-owned building and the removal of such as he may deem objectionable, or his making adverse public comments thereon, as being either within the scope of his duties as Mayor or so closely related thereto as to be entitled to an

absolute privilege by reason of his important public office. This Court long ago expressed opposition to the extension of the doctrine of absolute privilege *(Maurice v. Worden,* 54 Md. 233) to persons occupying offices not previously recognized as falling within the protection of absolute privilege. Though we are not deciding in this case whether or not the doctrine of absolute privilege should be extended to such an office as that of Mayor of a great city, we think that the same reasoning which underlies the reluctance to extend the offices to which the privilege applies, should also make us reluctant to stretch the field in which an absolute privilege may be invoked by adopting a very broad view of what may be deemed closely related to the general matters committed to the control or supervision of a public officer.

*Id.* at 172–73, 129 A.2d 148. Applying this narrow view of the scope of the mayor's public duties, the *Walker* Court held that "none of the acts complained of (including the statements alleged to have been made) are within the actual field of the defendant's powers or duties as Mayor or so closely related thereto as to be entitled to an absolute privilege, assuming (but not holding) such privilege to be accorded to the holder of that office." *Id.* at 173, 129 A.2d 148.

 Thus, even if Larsen enjoyed an absolute privilege as the head of a State agency (although we conclude in Part II.C.2 that he does not), he was not entitled to assert a privilege defense for the same "scope of public duties" reasons that he was not entitled to judgment on governmental immunity grounds. The trial court's error in determining that Larsen's public statements fell within the scope of his duties also tainted its finding that Larsen had an absolute privilege barring claims based on his allegedly tortious statements during the confidentiality period.[14] We hold that any unautho-

---

14. The allegations that Larsen's improper statements were made to the public, through the press, at a time that he had a duty of confidentiality, distinguishes this case from *Liberty Bank of Seattle, Inc. v. Henderson,* 75 Wash.App. 546, 878 P.2d 1259 (1994), *rev. denied,* 126 Wash.2d 1002, 891 P.2d 37 (1995), cited by Larsen. In that case, the defendants did not make statements that were statutorily prohibited at the time

rized tortious statements that Larsen made in violation of subsection 2–209(g) were not made in the performance of his public duties as Insurance Commissioner.

We reject Larsen's contentions that he was merely "performing his job" by "convey[ing] information to the public about ... matters [he is] assigned to regulate," and that "[t]his lawsuit vividly demonstrates why such statements must necessarily be privileged." To be sure, the concept of absolute executive privilege promotes important public policies by freeing executives from liability concerns. *See Restatement* § 591 cmt. a. But these policies are not unduly threatened by our narrow ruling that an executive is not entitled to an absolute privilege defense against a claim that he made tortious public statements in violation of a specific statute prohibiting such statements. In this instance, if Larsen was violating his public duty as defined by subsection 2–209(g), affording him an absolute executive privilege would destroy the very statute that he was sworn to execute.

## 2.

## Larsen Does Not Have An Absolute Privilege Based On His Position As The Head Of A State Agency

There is no Maryland precedent on the question of whether the Insurance Commissioner has an absolute privilege defense against a defamation or false light claim. Because this novel issue will arise again on remand, and Chinwuba raised it in this appeal, we address it for the convenience and guidance of both the court and the parties. *See* Md. Rule 8–131(a).

The trial court concluded that, by virtue of his important public office, Larsen had an absolute privilege, rather than a

---

they were made. *See id.* at 1270–71. Similarly, in *Compton v. Romans*, 869 S.W.2d 24 (Ky.1993), also cited by Larsen, the court's holding that the head of the Kentucky Racing Commission was entitled to an absolute privilege defense against claims that he made tortious statements to the media was premised on the fact that he had discretion to make the public statements in question. *See id.* at 27–28.

conditional privilege. It relied on the *Restatement*, which states that

> [a]ll of the state courts that have considered the question have agreed that the absolute privilege ... protects the superior officers of the state governments, including at least the governor, the attorney-general or the heads of state departments whose rank is the equivalent of cabinet rank in the Federal Government.

*Restatement* § 591 cmt. c. But the *Restatement* reporters also note that "[t]he majority of the state courts have declined to extend the absolute privilege beyond the superior state officers and have recognized as to other officers only a conditional privilege." *Id.,* reporters' notes on clause (b); *see, e.g., Vander Linden v. Crews,* 205 N.W.2d 686, 691 (Iowa 1973) (no absolute privilege for state board of pharmacy secretary); *Vigoda v. Barton,* 348 Mass. 478, 204 N.E.2d 441, 445 (1965) (same—superintendent of state hospital); *Stukuls v. New York,* 42 N.Y.2d 272, 397 N.Y.S.2d 740, 366 N.E.2d 829, 834 (1977)(same—president of state college); *Thomas v. Nicholson,* 21 V.I. 561, 564 (V.I.1985)(same—executive director of lottery).

▮▮ "The question whether a defamatory statement should be absolutely privileged involves a matter of public policy in which the public interest in free disclosure must be weighed against the harm to individuals who may be defamed." *Adams v. Peck,* 288 Md. 1, 5, 415 A.2d 292 (1980). Historically, the Court of Appeals has expressed great reluctance to extend either an absolute privilege under defamation law or an absolute immunity in other tort law contexts to a broad range of executive officials. In its benchmark case regarding absolute privilege for executive officials, *Maurice v. Worden,* 54 Md. 233 (1880), the Court held that the Superintendent of the United States Naval Academy was not entitled to an absolute privilege under Maryland defamation law. *See id.* at 253–54. Even though his allegedly defamatory publication "was made in the line of duty," the Court held that "this only clothes it with a privilege that is qualified." *Id.* at 254. "The doctrine of absolute immunity is so inconsistent with the

rule that a remedy should exist for every wrong, that we are not disposed to extend it beyond the strict line established by a concurrence of decisions." *Id.* at 253–54.

The Court of Appeals consistently has reaffirmed the narrow scope of the absolute privilege for executive communications. In *McDermott v. Hughley*, 317 Md. 12, 561 A.2d 1038 (1989), it described the continuing "reluctance of Maryland courts to extend absolute privilege beyond official communications to the heads of government and between departments[.]" *Id.* at 24, 561 A.2d 1038 (citing *Maurice*, 54 Md. at 233). Consequently, absolute privilege has been "afforded [only] to comments made with respect to . . . the activities of a limited number of high ranking executive officers." *Id.*

Maryland's reluctance to extend an absolute privilege solely on the basis of a job title mirrors the prevailing trend in federal courts and in many other jurisdictions. That trend, in both the narrow context of defamation privileges and the analogous context of absolute immunity from tort liability, is to determine whether an absolute bar to liability exists by focusing on the executive official's public duties rather than on the title of his or her public job. *See Mandel v. O'Hara*, 320 Md. 103, 118–21, 576 A.2d 766 (1990).

The Supreme Court has taken a functional approach to the question, with an understanding that in most cases, a qualified privilege or immunity provides sufficient protection to executive officials. *See id.; see also Barr v. Matteo*, 360 U.S. 564, 573, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434 (1959)("It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted"). Thus, courts have tended to adopt a general rule of conditional privilege for most executives, for the same reasons that they have adopted a general rule of qualified immunity for the same officials.

We find the Supreme Court's rationale for refusing to extend the absolute immunity enjoyed by the President of the United States to his appointed cabinet members and staff provides a sound explanation for why a conditional

privilege provides adequate protection for all but the highest executive officials in this State. For "executive officials in general, . . . qualified immunity represents the norm." *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). "Where an official could be expected to know that certain conduct would violate statutory . . . rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739. Accordingly, "[t]he burden of justifying absolute immunity rests on the official asserting the claim." *Id.,* 457 U.S. at 812, 102 S.Ct. at 2735. An executive official seeking absolute immunity "first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability." *Id.,* 457 U.S. at 813, 102 S.Ct. at 2735. Next, the official "must demonstrate that he was discharging the protected function when performing the act for which liability is asserted." *Id.*

■ Applying these principles in the executive privilege context, we conclude that Larsen is not entitled to assert an absolute privilege defense to the defamation and false light counts. Although Commissioner Larsen is the head of a Maryland state agency, the Maryland Insurance Administration is an independent executive agency, not a principal, or "cabinet-level" department. *See* Ins. § 2–101(a)(2); *Maryland Manual 2001,* at 160, 245. In other tort contexts, Larsen has only a qualified immunity. *See* CJ § 5–522(b). In this defamation context, Larsen has not offered any reasonable justification for why his public office should be given an absolute, rather than a conditional, privilege to make defamatory public statements.

We hold that the Insurance Commissioner may assert only a conditional privilege. A conditional privilege affords adequate protection for any statements that the Commissioner

may make in the proper exercise of his or her discretion to communicate with the public regarding important insurance regulatory matters.

 This conditional privilege has the same "scope of duty" limitation as an absolute privilege or a qualified immunity. "One who upon an occasion giving rising to a conditional privilege publishes defamatory matter concerning another, abuses the privilege if he does not reasonably believe the matter to be necessary to accomplish the purpose for which the privilege is given." *Restatement* § 605. Because there is no conditional privilege to make tortious statements that are not within the scope of one's public duty, a conditional privilege may be lost by excessive publication to third parties "other than those whose hearing is reasonably believed to be necessary or useful to the protection of the interest[.]" *Gen'l Motors Corp. v. Piskor*, 277 Md. 165, 173, 352 A.2d 810 (1976). "[R]esolution of whether the [conditional] privilege has been abused ... is ordinarily a jury question." *McDermott*, 317 Md. at 30, 561 A.2d 1038. In this case, the dispute regarding whether Larsen made tortious public statements outside the scope of his public duties, by excessively publishing them to the press in violation of subsection 2–209(g), also precluded dismissal on the basis of a conditional privilege.

## D.

### The Absolute Judicial Privilege For Defamatory Statements Did Not Encompass All Of The Defamatory Statements Alleged In This Case

The trial court also held that "some of the published statements fall within the judicial proceedings privilege," including the absolute privilege for "communication that was made in preparation for litigation...." It specifically found that

[t]he statements complained of, for example, the statements that the certifications were false and misleading or the publication of information in the Report, are within the privilege. Therefore, [Chinwuba] cannot complain of any Petition or other pleading filed by the Commissioner or any

statement made in the course of the receivership proceedings, or of any newspaper articles accurately summarizing such pleadings or statements because they fell within the Judicial Privilege.

 "[S]tatements uttered in the course of a trial or contained in pleadings, affidavits, or other documents related to a case fall within an absolute privilege, and therefore cannot serve as the basis for an action in defamation." *Woodruff v. Trepel,* 125 Md.App. 381, 391, 725 A.2d 612, *cert. denied,* 354 Md. 332, 731 A.2d 440 (1999). Thus, we agree with the trial court that statements Larsen made in any pleading filed in any judicial or quasi-judicial proceeding undertaken in any case relating to Chinwuba, including the PrimeHealth receivership proceedings, were "judicially privileged." [15]

 Where we part company with the trial court is on whether the privilege covers publication of the challenged statements Larsen made in his March 1998 letters to Prime-Health, and any statements he made directly to the press, in violation of subsection 2–209(g). We recognize that statements in a document that was prepared for possible use in litigation, but not actually filed in a judicial or quasi-judicial proceeding, may be within the scope of the judicial privilege. *See, e.g., Adams,* 288 Md. at 7–8, 415 A.2d 292 (judicial privilege covered psychiatrist's opinion that father had abused child, made in evaluation report, because it was prepared in connection with contested divorce proceeding); *Woodruff,* 125 Md.App. at 394, 725 A.2d 612 (privilege covered attorney's statement that father abused child, made in letter to father's attorney, because it related to pending litigation and potential future litigation regarding child custody and visitation); *Arundel Corp. v. Green,* 75 Md.App. 77, 85, 540 A.2d 815 (1988)(privilege covered attorney's statement in letter sent to

---

**15.** We also note that any allegedly defamatory statements contained in the body of the proposed report were made by the MIA, through named MIA examiners who are not parties to this action. As we previously held in section II.A, Chinwuba's claims against the MIA are barred by his failure to give the notice required under the MTCA.

employees of crushed stone supplier, requesting information relating to asbestos exposure from stone dust, because it was made in preparation for litigation).

But we recently cautioned that the scope of judicial privilege "is not boundless." *Woodruff,* 125 Md.App. at 397, 725 A.2d 612. In *Woodruff,* we emphasized that absolute privilege for judicial proceedings should not be extended when doing so does not serve the important public interest for which it was created—"the unfettered disclosure of information needed for a judicial or quasi-judicial decision-making process." *Id.* at 399, 725 A.2d 612. We also recognized that a judicially privileged disclosure must be made in a forum that has adequate procedural safeguards designed to minimize the occurrence of defamatory statements. *See Gersh v. Ambrose,* 291 Md. 188, 197, 434 A.2d 547 (1981); *Woodruff,* 125 Md.App. at 399, 725 A.2d 612. We pointed out that courts have declined to extend an absolute judicial privilege when the challenged statement was made to an entity with no conceivable role in a judicial or quasi-judicial proceeding, or was made in a forum that does not provide adequate procedural protections. *See, e.g., Gersh,* 291 Md. at 196, 434 A.2d 547 (no absolute privilege for witness testifying before community relations commission, because it was tantamount to "an ordinary open public meeting" with no procedural safeguards for defamed persons); *McDermott,* 317 Md. at 26, 561 A.2d 1038 (no absolute privilege for psychologist's report to police department employing plaintiff, because "there was no public hearing adversary in nature; no compellable witnesses were sworn or cross-examined; no reviewable opinion or analysis was generated"); *Kennedy v. Cannon,* 229 Md. 92, 98–99, 182 A.2d 54 (1962)(defense attorney's defamatory statements to press relating to pending criminal proceeding were not absolutely privileged because they had no relation to the prosecution); *Woodruff,* 125 Md.App. at 399–400, 725 A.2d 612 (no absolute privilege for plaintiff who republished allegedly defamatory letter about ex-husband to school principal, because school had no judicial role and report "did not further the administration of justice").

In this case, we hold that the absolute judicial privilege does not extend to any letters or direct statements to the press that Larsen may have given *during the confidentiality period.* The publication of these letters and statements to the press does not serve any judicial purpose, because the press could not play a role in any judicial or administrative proceeding relating to PrimeHealth or Chinwuba. *Cf. Kennedy,* 229 Md. at 99, 182 A.2d 54 ("an attorney who wishes to litigate his case in the press will do so at his own risk"); *Woodruff,* 125 Md.App. at 399, 725 A.2d 612 ("[t]he school is not a tribunal and is not engaged in a judicial or quasi-judicial role"). Moreover, publication of such statements via informal press contacts provides absolutely no procedural safeguard that would minimize the prospect of defamatory statements. *Cf. McDermott,* 317 Md. at 26, 561 A.2d 1038 ("most significantly, [the public employee] did not have the opportunity to present his side of the story"); *Gersh,* 291 Md. at 196, 434 A.2d 547 ("[t]he public benefit to be derived from testimony at Commission hearings of this type is not sufficiently compelling to outweigh the possible damage to individual reputations to warrant absolute [judicial] immunity").

To the contrary, we view subsection 2–209(g) as a legislative directive that the MIA must refrain from making public accusations of wrongdoing against persons under investigation until its examination is complete and its proposed report has become final, *precisely because* such untested accusations do not provide an aggrieved person adequate procedural protections to minimize the possibility of the MIA inflicting "unwarranted injury" by publishing inaccurate or untrue charges. Accordingly, we hold that any statements that Larsen knowingly made to the press in violation of subsection 2–209(g) are not protected by an absolute judicial privilege.

### E.

### The Trial Court Properly Dismissed Chinwuba's Abuse of Process Claim Against Larsen

The trial court dismissed Chinwuba's abuse of process claim in Count III because he failed to allege the essential

element of willful misuse of process in a manner not contemplated by law. *See One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29, 38, 694 A.2d 952 (1997). We shall affirm the judgment. If Chinwuba intended to complain about the initiation and prosecution of the receivership action against Prime-Health, he did not specifically do so. Even if he had, there was ample evidence to support a judgment in favor of Larsen, given that PrimeHealth consented to the receivership, thereby validating the use of process in the receivership proceedings.

### F.

## The Trial Court Properly Entered Summary Judgment On Chinwuba's Due Process Claim Against Larsen

Chinwuba complained in Count IV that he was denied "an opportunity for a hearing to disprove" potentially criminal allegations that he "provid[ed] false testimony under oath ... to obtain a certificate of authority for PrimeHealth," and that "he should not be trusted in his business activities with PrimeHealth[.]" Asserting violations of Articles 24 and 26 of the Maryland Declaration of Rights, Chinwuba again points to Larsen's illegal and "stigmatizing leaks to the newspapers in violation of ... § 2–209(g)."

Based on pleadings and evidence outside the complaint, the trial court granted summary judgment in favor of Larsen.[16] The court held that (1) this issue was finally adjudicated in a prior appeal; (2) Chinwuba had ample opportunity to present his argument, which was ultimately incorporated into the final

---

16. When a trial court's decision to dismiss one of the counts was predicated on evidence outside the complaint, we recognize that the court actually granted summary judgment. *See* Md. Rule 2–322(c); *Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 93 Md.App. 772, 783, 614 A.2d 1021 (1992), *cert. denied*, 330 Md. 319, 624 A.2d 490 (1993). The existence of a factual dispute material to determining the liability of the moving party creates a jury question that may not be resolved on the pleadings. *See* Md. Rule 2–501(e); *Hrehorovich*, 93 Md.App. at 785, 614 A.2d 1021.

report; and (3) he failed to show that he was denied an interest in "liberty or property."

To the extent that Chinwuba is complaining that he was denied a contested case hearing to challenge the allegations in the proposed report, we previously resolved that issue. We held in *PrimeHealth Corp. v. Ins. Comm'r,* 133 Md.App. 375, 758 A.2d 539 (2000), that Chinwuba did not have a right to a hearing on the proposed report. Alternatively, to the extent that Chinwuba is complaining that Larsen otherwise deprived him of due process by making premature accusations during the confidentiality period, we find the claim without merit.

■■■ Chinwuba essentially seeks to "upgrade" his defamation and false light counts into a due process claim. He posits that by violating subsection 2–209(g), Larsen simultaneously deprived Chinwuba of the hearing opportunity that he was entitled to under subsection 2–210. We disagree. As "a person aggrieved by [an] act of ... the Commissioner," Chinwuba had the right to object to any of Larsen's improper public statements by submitting a written request for a hearing, specifying the subject of his complaint. *See* Ins. § 2–210(b)(1). As we have previously stated, Chinwuba did not do so. Thus, any lack of administrative "process" with respect to Larsen's public statements during the confidentiality period resulted from Chinwuba's own failure to act. Consequently, Chinwuba is limited to challenging Larsen's statements and disclosures during the confidentiality period through his defamation and false light causes of action.

**JUDGMENT IN FAVOR OF APPELLEE MARYLAND INSURANCE ADMINISTRATION AFFIRMED. JUDGMENT IN FAVOR OF APPELLEE LARSEN ON COUNTS III (ABUSE OF PROCESS) AND IV (VIOLATION OF MARYLAND DECLARATION OF RIGHTS) AFFIRMED. REMAINING JUDGMENTS IN FAVOR OF LARSEN ON COUNTS I (DEFAMATION) AND II (FALSE LIGHT) VACATED, AND CASE REMANDED FOR FURTHER PROCEEDINGS ON THOSE CLAIMS,**

CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ½ BY APPELLANT, ½ BY APPELLEE LARSEN.