832 A.2d 193

**Steven B. LARSEN, Maryland Insurance Commissioner**

**v.**

**Christian E. CHINWUBA.**

**No. 25, Sept. Term, 2002.**

Court of Appeals of Maryland.

Sept. 10, 2003.

94

Carmen M. Shepard, Deputy Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Andrew H. Baida, Solicitor Gen., Randolph S. Sergent, Asst. Atty. Gen., on brief), Baltimore, for petitioner.

Sunanda K. Holmers, Chevy Chase, for respondent.

Argued before BELL, C.J. ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

ELDRIDGE, J.

The Maryland Insurance Commissioner in the course of a statutorily authorized investigation into the financial affairs and solvency of a Maryland health maintenance organization ("HMO"), and shortly before instituting receivership proceedings against the HMO, sent letters to the HMO requesting information. The Commissioner allegedly disclosed the contents of these letters to the press, along with making statements to the press about the investigation. The single dispositive issue in this defamation and invasion of privacy action against the Commissioner, by the principal official associated with the HMO, is whether the Commissioner's actions were within the scope of his public duties. If they were, the Commissioner was entitled to immunity under the Maryland Tort Claims Act.[1] We shall hold that the Commissioner's

---

1. The pertinent provisions of the Maryland Tort Claims Act, Code (1984, 1999 Repl.Vol.), § 12–105 of the State Government Article, and Code (1974, 2002 Repl.Vol.), § 5–522(b) of the Courts and Judicial Proceedings Article, grant to State personnel an immunity from a tort suit for a tortious act "that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and

actions, forming the basis for this tort suit, were within the scope of his public duties. Accordingly, the Commissioner was entitled to immunity.

## I.

The relevant facts of this case were set forth in the reported opinion of the Court of Special Appeals as follows (*Chinwuba v. Larsen,* 142 Md.App. 327, 339–345, 790 A.2d 83, 89–93 (2002) (footnotes omitted)):

"This is another appellate chapter arising from the misfortunes of PrimeHealth Corporation ('PrimeHealth'), a defunct Maryland health maintenance organization ('HMO'). Christian Chinwuba, M.D., appellant, was the primary owner of PrimeHealth, until the State placed the insolvent HMO into receivership. In this case, Chinwuba complains about certain statements and actions of the Maryland Insurance Administration (the 'MIA') and its Commissioner, Steven B. Larsen (the 'Commissioner'), appellees, during the investigation leading up to that receivership.

"In the Circuit Court for Prince George's County, Chinwuba filed a four count complaint against the MIA and Larsen, alleging defamation, false light invasion of privacy ('false light'), abuse of process, and violation of due process under Articles 24 and 26 of the Maryland Declaration of Rights. The MIA and Larsen successfully moved to transfer the case to the Circuit Court for Baltimore City, and then moved to dismiss the complaint, or, in the alternative, for summary judgment.

\* \* \*

"In reviewing the dismissal of a complaint, we credit the allegations of the complaint, and draw all reasonable inferences in favor of the plaintiff. \* \* \* Consequently, this opinion features Chinwuba's version of events. . . .

\* \* \*

___

for which the State or its units have waived immunity" under the provisions of the Tort Claims Act.

"Dr. Chinwuba, a radiologist, had an ownership share in PrimeHealth, through ownership of PrimeHealth's sole shareholder, and was the sole owner of Diagnostic Health Imaging Systems, Inc. ('DHIS'). In November 1995, PrimeHealth applied to the MIA for a certificate of authority to operate as an HMO in Maryland. In support of the application, Chinwuba submitted an affidavit describing a transfer of certain medical equipment by DHIS to PrimeHealth. The purpose of the transfer was to ensure that PrimeHealth had a minimum surplus of $1.5 million in assets, as required by the MIA's solvency standards for health maintenance organizations. In its initial audit, the MIA raised concerns that PrimeHealth did not meet this requirement. With the 'acquisition' of the medical equipment from DHIS, PrimeHealth had sufficient assets to satisfy the standard. In December 1996, however, 'DHIS became totally operationally defunct.'

"Based on the effect of this transfer on DHIS, the MIA became concerned that DHIS creditors might be able to challenge it as a fraudulent conveyance. On August 28, 1996, the MIA asked Chinwuba to provide a notarized statement disclosing '[a]ny and all liabilities or debts of DHIS, and any and all liens or encumbrances on the assets of DHIS immediately preceding the gift of assets to PrimeHealth.' Chinwuba was asked to attest that neither he nor DHIS was aware of any creditors 'that could have the gift of DHIS' accounts receivable and equipment set aside or annulled to satisfy their claim or levy' or 'that would force DHIS to file for bankruptcy in the foreseeable future.'

"Chinwuba responded to the MIA's request [by three separate certifications in September 1996, the first two of which were notarized].

\* \* \*

"The third certification ... [stated] that 'DHIS does not have any other liabilities or debts or any liens or encumbrances on the "contributed" assets of DHIS[.]' In November 1996, relying on Chinwuba's statements in all three

certifications, the MIA granted PrimeHealth a certificate of authority to operate as an HMO.

\* \* \*

"By early 1998, the MIA claimed that it had discovered millions of dollars in judgments against DHIS, that these judgments had been in existence when DHIS transferred the medical equipment to PrimeHealth, and that none of these judgments had been disclosed in any of Chinwuba's certifications. In a March 11, 1998 letter, Commissioner Larsen informed PrimeHealth that the MIA had 'grave concerns covering a number of critical areas relating to PrimeHealth's ongoing ability to maintain licensure,' and outlined those concerns. The opening paragraph of the letter acknowledged that the MIA already had begun a 'review' of the gift of medical equipment that Chinwuba certified had been made by DHIS to PrimeHealth.

\* \* \*

"With respect to the DHIS liabilities, Larsen wrote that '[r]ecently, during the course of our investigation, the [MIA] has uncovered a substantial number of judgments against DHIS which existed at the time of the conveyance of the equipment to PrimeHealth and which have not been extinguished in the court records of Prince George's County.' Larsen specifically stated that '[t]he veracity of [Chinwuba's] critical notarized statement [regarding the existence of creditors that could challenge the DHIS transfer of the medical equipment to PrimeHealth] is ... in doubt.' Asserting that he 'intend[ed] to continue [his] inquiry into this matter,' Larsen demanded 'a full explanation as to why Dr. Chinwuba certified that no additional judgments existed when the court records clearly indicate otherwise; ... and why the [MIA] should not have concerns relating to the management based on the criteria listed above.'

"PrimeHealth responded through its attorneys, by letter dated March 27, 1998. The letter was accompanied by affidavits and attachments that purported to address 'the three areas of concern, ownership/control, the transfer of

assets to PrimeHealth, and the fitness of management, which were raised in [Larsen's] letter of March 11.' Prime-Health interpreted the MIA's concerns regarding its management team as related to 'your interpretation of Dr. Chinwuba's notarized statement of September 6, 1996.' In the letter and a supporting affidavit, PrimeHealth took the position that 'Dr. Chinwuba was correct in his assertion that the subject equipment was unencumbered at the time it was transferred to PrimeHealth, except as otherwise disclosed to the [MIA].'

"Larsen replied to PrimeHealth's explanation letter, by letter dated March 31, 1998, which set forth 'new and continued concerns.' The MIA issued a draft 'Limited Scope Examination Report' (the 'proposed report'), detailing various deficiencies in PrimeHealth's operations. Among the matters addressed in the proposed report were Chinwuba's certifications regarding the transfer of medical equipment. The proposed report stated that those certifications were false and misleading, in that they failed to disclose the DHIS liabilities."

In his Circuit Court complaint, Dr. Chinwuba alleged that Insurance Commissioner Larsen "violated the Maryland Insurance Code" by releasing to the press the March 11th letter, PrimeHealth's March 27th letter, and the March 31st letter, and that the statements in the March 11th and 31st letters were false, malicious, and defamatory. The complaint also alleged that, when he released to the press the March 11th and March 31st letters, the Insurance Commissioner verbally made false, malicious, and defamatory statements about Dr. Chinwuba to the press. In addition, the complaint alleged that the draft "Report" dated March 31, 1998, and submitted to PrimeHealth on or about August 7, 1998, "classified Chinwuba as untrustworthy, unfit and unreliable to own any interest in an HMO in the State of Maryland," and "was false, misleading and was intentionally designed to place Chinwuba in false light in the media, public and in the business community both within and without the State of Maryland." Finally, the complaint recited that, on August 23, 1998, the Maryland

Insurance Administration and Commissioner Larsen instituted receivership proceedings against PrimeHealth in the Circuit Court for Baltimore City, and that the pleadings in the receivership proceedings alleged "various wrongdoing and fraudulent acts on the part of Chinwuba."

As earlier mentioned, the Maryland Insurance Administration and Insurance Commissioner Larsen filed a motion to dismiss or, in the alternative, for summary judgment. With regard to the action against the Insurance Administration, the motion asserted that the plaintiff had failed to comply with the procedural requirements of the Maryland Tort Claims Act. The motion further alleged that Insurance Commissioner Larsen was acting within the scope of his public duties and, therefore, was entitled to both common law public official immunity and statutory immunity under the Maryland Tort Claims Act. Alternatively, the defendants contended that the Insurance Commissioner's letters, statements, and report were subject to an absolute privilege. As a further alternative ground, the defendants asserted that the factual allegations of the complaint were insufficient to set forth causes of action for defamation, invasion of privacy, abuse of process, or violation of rights guaranteed by the Maryland Declaration of Rights.

After a hearing, the Circuit Court for Baltimore City filed an order granting the defendants' motion to dismiss with regard to all four counts of the complaint. The Circuit Court also filed an extensive opinion explaining its decision. The court held that the action against the Maryland Insurance Administration was barred by the plaintiff's failure to file a written claim with the State Treasurer and to serve the State Treasurer, as required by the Maryland Tort Claims Act.

As to the claims against the Insurance Commissioner, the Circuit Court held that, under the allegations of the complaint, the Commissioner's complained of actions all fell within the scope of his public duties. The court also held that the factual allegations of the complaint were insufficient to show that the Commissioner acted with malice. Accordingly, regarding the nonconstitutional tort claims, the Circuit Court held that the

Commissioner was entitled to both common law public official immunity and statutory immunity under the Maryland Tort Claims Act.

The Circuit Court alternatively held that the Insurance Commissioner, as the head of the Maryland Insurance Administration, had an " 'absolute privilege to publish defamatory matter concerning [Dr. Chinwuba] in communications made in the performance of his official duties,' " quoting RESTATEMENT (SECOND) OF TORTS, § 591. The court held, "[i]n addition, [that] some of the published statements fall within the judicial proceedings privilege."

Finally, the Circuit Court held that the allegations of the complaint failed to state causes of action for abuse of process or for violations of Articles 24 or 26 of the Maryland Declaration of Rights.

Dr. Chinwuba took an appeal to the Court of Special Appeals. The intermediate appellate court upheld the order transferring the case to the Circuit Court for Baltimore City. In addition, the Court of Special Appeals affirmed the judgment in favor of the Maryland Insurance Administration, affirmed the judgment in favor of Commissioner Larsen on the abuse of process count (count three), affirmed the judgment in favor of Commissioner Larsen on the count alleging violations of the Maryland Declaration of Rights (count four), and vacated the judgments in favor of the Commissioner on the defamation and invasion of privacy counts (counts one and two). *Chinwuba v. Larsen, supra,* 142 Md.App. at 397–398, 790 A.2d at 124.

In affirming the judgment in favor of the Maryland Insurance Administration, the Court of Special Appeals agreed with the Circuit Court that the plaintiff's failure to give notice of his claim to the State Treasurer, as required by the Maryland Tort Claims Act, barred the action against the Insurance Administration. 142 Md.App. at 353–357, 790 A.2d at 98–100. The Court of Special Appeals also upheld the Circuit Court's decisions that the factual allegations of the complaint were insufficient to show that Commissioner Larsen acted with

"malice" or "to benefit his own political career or reputation," insufficient to set forth a cause of action for abuse of process, and insufficient to allege a violation of the Maryland Declaration of Rights. 142 Md.App. at 380–384, 395–397, 790 A.2d at 114–116, 123–124.

Nevertheless, the Court of Special Appeals disagreed with the Circuit Court's dismissal of the counts charging Commissioner Larsen with defamation and invasion of privacy on the ground that, according to the intermediate appellate court, the Commissioner was not acting within the scope of his duties. The Court of Special Appeals reached this conclusion based on its view that the Commissioner's disclosures, prior to the completion of his examination and final report, violated Maryland Code (1997, 2002 Supp.), § 2–209(g) of the Insurance Article. Section 2–209(g) provides in pertinent part as follows:

"(g) *Disclosure to regulatory or law enforcement agency* ... -(1) Subject to paragraph (2) of this subsection, *the Commissioner may disclose the preliminary examination report, investigation report, or any other matter related to an examination made under § 2–205 ... only to the insurance regulatory agency of another state or to a federal, State, local, or other law enforcement agency.*

(2) A disclosure may be made under paragraph (1) of this subsection only if:

(i) the disclosure is made for regulatory, law enforcement, or prosecutorial purposes;

(ii) the agency receiving the disclosure agrees in writing to keep the disclosure confidential and in a manner consistent with this section; and

(iii) the Commissioner is satisfied that the agency will preserve the confidential nature of the information.

(3) Notwithstanding the provisions of this subsection, final reports of examinations are considered public documents and may be disclosed to the public." (Emphasis added.)

The Court of Special Appeals rejected various arguments by the Insurance Commissioner that the Commissioner's disclo-

sures did not violate § 2–209(g) and that the release of the letters and other disclosures were fully authorized. The intermediate appellate court stated "that Chinwuba adequately alleged specific facts that raised a factual dispute about whether Larsen made tortious statements to the press ... during the confidentiality period ... established by subsection 2–209(g)." 142 Md.App. at 380, 790 A.2d at 114. The Court of Special Appeals held that "Larsen's violation of subsection 2–209(g), *by itself,* [would] be grounds to hold as a matter of law that Larsen acted outside the scope of his public duties" and that "disclosures in violation of subsection 2–209(g) cannot be made 'in the performance of the Commissioner's public duties,'" 142 Md.App. at 376, 378, 790 A.2d at 111, 113 (emphasis in original).

Pointing out that neither common law public official immunity nor statutory immunity under the Maryland Tort Claims Act, § 5–522(b) of the Courts and Judicial Proceedings Article, applied to acts of a public official or public employee which were not within the scope of the official's or employee's public duties, the Court of Special Appeals held that, under Dr. Chinwuba's allegations, the Insurance Commissioner was not entitled to immunity. 142 Md.App. at 359–360 n. 9, 380, 790 A.2d at 101–102 n. 9, 114.

The Court of Special Appeals further held that neither absolute privilege nor qualified or conditional privilege, for communications by a government official, applied to statements made outside the scope of the official's governmental duties. Therefore, according to the intermediate appellate court, the allegations that Commissioner Larsen violated § 2–209(g) "precludes judgment on privilege grounds." 142 Md. App. at 386, 790 A.2d at 117. Nevertheless, as dicta, and "for the convenience and guidance of both the court and the parties," the Court of Special Appeals stated *its* view that any government official privilege, to which an Insurance Commissioner would be entitled, would be a qualified or conditional privilege. 142 Md.App. at 388–392, 790 A.2d at 119–121. Finally, the Court of Special Appeals held that the absolute privilege for statements in connection with judicial proceed-

ings "does not extend to any letters or direct statements to the press that Larsen may have given *during the confidentiality period.*" 142 Md.App. at 395, 790 A.2d at 122 (emphasis in original).

## II.

Insurance Commissioner Larsen filed in this Court a petition for a writ of certiorari, presenting the following two questions:

"1. Does the absolute privilege that protects superior officers of State government extend to the Maryland Insurance Commissioner?

"2. Does the head of a State agency act within the scope of his public duties by making statements concerning his agency's investigation of a matter of public concern, particularly when it is undisputed that those statements were not motivated by malice or any desire for personal gain?"

Dr. Chinwuba did not file a cross-petition for a writ of certiorari challenging any of the Court of Special Appeals holdings which were adverse to him. This Court granted the Insurance Commissioner's petition, *Larsen v. Chinwuba,* 369 Md. 179, 798 A.2d 551 (2002). We shall reverse in part the Court of Special Appeals' decision, and shall direct that the judgments of the Circuit Court be affirmed in their entirety.

Although numerous issues were raised in both courts below, most of them need not and will not be reached by this Court. As pointed out above, several rulings by the Court of Special Appeals, adverse to Dr. Chinwuba, have not been challenged in this Court by a cross-petition for a writ of certiorari. Accordingly, in the present posture of the case, Dr. Chinwuba is bound by the determinations of both courts below that the factual allegations of his complaint were insufficient to allege malice on the part of Commissioner Larsen and insufficient to state claims for abuse of process or violations of the Maryland Declaration of Rights. Furthermore, Commissioner Larsen's petition for a writ of certiorari did not challenge the Court of Special Appeals' holding regarding the absolute privilege for

statements in judicial proceedings, and, therefore, we have no occasion to explore that question.

While Commissioner Larsen does contest the Court of Special Appeals' dicta regarding the nature of Commissioner Larsen's privilege for statements by high level government officials, that is also a nonissue. If the statements were made in the scope of the Commissioner's public duties, and in light of the holding of no malice, Commissioner Larsen, under the Court of Special Appeals' opinion, would be protected by either an absolute or a conditional privilege.

▇ Since, as we shall hold, Commissioner Larsen's statements were made in the course of his public duties, he is entitled to statutory immunity under the Maryland Tort Claims Act, §§ 12–105 of the State Government Article and 5–522(b) of the Courts and Judicial Proceedings Article. That holding is dispositive of both the defamation and invasion of privacy counts. Consequently, there is no need for this Court to reach any privilege or public official immunity issues, and we shall not do so.

Commissioner Larsen makes several alternative arguments against the Court of Special Appeals' holding that he acted outside of the scope of his public duties. He contends that his disclosures were true and authorized by the Insurance Article of the Code rather than made in violation of § 2–209(g) (petitioner's brief at 14–17), that § 2–209(g) was not violated because the disclosures were prior to the "examination" period within the meaning of § 2–209(g) (*id.* at 17–18, 798 A.2d 551), and that "the Commissioner did not violate § 2–209(g) because the disclosures at issue did not involve § 2–209(g) protected material" (*id.* at 18, 798 A.2d 551). In addition, the Commissioner maintains that, even if the disclosures were in violation of § 2–209(g), they were made within the scope of the Commissioner's public duties (*id.* at 20–27, 798 A.2d 551).

We shall assume, *arguendo*, that the Insurance Commissioner's disclosures violated § 2–209(g) of the Insurance Article. Nonetheless, we agree with the Commissioner and the Circuit Court that, even if the disclosures violated the statuto-

ry provision, they were made in the scope of the Commissioner's public duties.

## III.

 Section 5–522(b)'s phrase, "within the scope of the public duties of the State personnel," for purposes of a State official's or employee's immunity from suit under the Maryland Tort Claims Act, generally "is coextensive with the common law concept of 'scope of employment' under the doctrine of respondeat superior,' " *Sawyer v. Humphries,* 322 Md. 247, 254, 587 A.2d 467, 470 (1991).[2]

In *Sawyer v. Humphries, supra,* 322 Md. at 255, 587 A.2d at 470–471, we summarized the general principles for determining scope of employment as follows:

"The general test set forth in numerous Maryland cases for determining if an employee's tortious acts were within the scope of his employment is whether they were in furtherance of the employer's business and were 'authorized' by the employer. In an often-quoted passage, the Court in *Hopkins C. Co. v. Read Drug & C. Co.,* 124 Md. 210, 214, 92 A. 478, 479–480 (1914), explained:

"The simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By 'authorized' is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and

---

**2.** At the time the *Sawyer v. Humphries* case arose, what is presently § 5–522(b) of the Courts and Judicial Proceedings Article was codified as Code (1984, 1985 Supp.), § 12–105 of the State Government Article.

Recent opinions of this Court discussing § 5–522(b) of the Courts and Judicial Proceedings article include *Okwa v. Harper,* 360 Md. 161, 179–182, 757 A.2d 118, 127–129 (2000), and *Shoemaker v. Smith,* 353 Md. 143, 157–164, 725 A.2d 549, 557–560 (1999).

positive orders." (quoting from *Wood on Master and Servant* § 279 (1877)).

"*Accord, e.g., Wood v. Abell,* 268 Md. 214, 227, 300 A.2d 665, 671–672 (1973); *Drug Fair v. Smith,* 263 Md. 341, 350, 283 A.2d 392, 397 (1971); *LePore v. Gulf Oil Corp.,* 237 Md. 591, 595, 207 A.2d 451, 453 (1965); *Lewis v. Accelerated Transport-Pony Express, Inc.,* 219 Md. 252, 255, 148 A.2d 783, 785 (1959); *East Coast Lines v. Mayor & City Council of Baltimore,* 190 Md. 256, 285, 58 A.2d 290, 303–304 (1948).

"In applying this test, there are few, if any absolutes. Nevertheless, various considerations may be pertinent. The Court, in *East Coast Lines v. Mayor & City Council of Baltimore, supra,* 190 Md. at 285, 58 A.2d at 304, summarized four of them:

'To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master. *Mechem on Agency,* Section 36; *Huffcut on Agency,* Section 5; *American Law Institute, Restatement, Agency,* Section 228, comment (b).' "

The Court in *Sawyer* continued by relying upon an earlier Maryland case which had quoted with approval various factors set forth in the *Restatement of Agency* for deciding scope of employment issues (*Sawyer,* 322 Md. at 255–256, 587 A.2d at 471):

"In *Great A. & P. Co. v. Noppenberger,* 171 Md. 378, 390–391, 189 A. 434, 440 (1937), after setting forth the factors quoted above, the court went on to quote with approval the *Restatement of Agency,* § 229 (1933), as follows:

'On the other hand, certain conduct of the servant may be within the scope of his employment, although not intended or consciously authorized by the master, but "(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental

to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:-(a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act and to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal.' *Id.*, 229."

The numerous factors set forth in *Sawyer* and prior authorities all lead to the conclusion that the challenged disclosures were made within the scope of the Insurance Commissioner's employment. Certainly, as a general matter, the head of a major agency in the executive branch of government is authorized to disclose to the public matters concerning the agency's operations. *Cf.* Code (1997, 2002 Supp.), § 2–110(a)(10) of the Insurance Article (Insurance Commissioner to include in his or her reports "any other relevant information that the Commissioner considers proper"). The Insurance Commissioner's disclosures were made during the regular course of business and related entirely to the operations of the Insurance Administration. They were incidental to the business of managing the Insurance Administration.

While we have assumed, solely for purposes of this case, that the disclosures violated § 2–209(g) of the Insurance Article, they were clearly not " 'seriously criminal' " acts. *Great A.P. v. Noppenberger*, 171 Md. 378, 391, 189 A. 434, 440 (1937). They do not resemble the types of intentional criminal acts

which this Court has held fall outside of the scope of employment. *See, e.g., Wolfe v. Anne Arundel County,* 374 Md. 20, 34–37, 821 A.2d 52, 61–62 (2003) (A police officer, after telling the police dispatcher that he was "out of service," drove with the victim to a remote location and raped her); *Sawyer v. Humphries, supra,* 322 Md. at 251, 587 A.2d at 468 (Off-duty police officer picked up some rocks and threw them at the victims); *Henley v. Prince George's County,* 305 Md. 320, 326–327, 330 n. 2, 503 A.2d 1333, 1336, 1338 n. 2 (1986) (A caretaker sodomized and murdered the victim by stabbing him to death).

The opinion in *Sawyer v. Humphries* pointed to a very important factor in cases of alleged intentional wrongdoing, saying (322 Md. at 256–257, 587 A.2d at 471);

> "Furthermore, and particularly in cases involving intentional torts committed by an employee, this Court has emphasized that where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours and at an authorized locality, the employee's actions are outside the scope of his employment."

*See also Ennis v. Crenca,* 322 Md. 285, 294–296, 587 A.2d 485, 489–491 (1991), where this Court, relying on the above-quoted passage from *Sawyer,* held that defamatory statements by a public official, made as "a political act undertaken for her own benefit" and not to further governmental business, were not within the scope of the official's employment. In the case at bar, both courts below held that Dr. Chinwuba's allegations were insufficient "to state a claim that Larsen deliberately made tortious public statements in order to humiliate or harm Chinwuba, or to benefit his [Larsen's] own political career or reputation," *Chinwuba v. Larsen, supra,* 142 Md.App. at 383–384, 790 A.2d at 116.

The sole factor relied upon by the Court of Special Appeals, for its holding that the Insurance Commissioner's disclosures were not within the scope of his employment, was that the

disclosures were wrongful because they allegedly violated a statute. Of course, in all tort cases presenting the issue of whether an employee's acts were within the scope of employment, the acts are going to be wrongful. Otherwise, there is no tort. Moreover, in numerous tort/respondent superior cases, the wrongful act is in violation of a statute. This is probably true in the overwhelming majority of motor vehicle accident tort cases. An employee, otherwise acting in the scope of his or her employment, does not lose that status because the employee's tortious act violated a motor vehicle statute or any other statute.

Very seldom will an employer specifically authorize an employee to violate a statute, and such authorization is not required for scope of employment purposes. Instead, the key is whether the employee's tortious act " 'was incident to the performance of the duties entrusted to him by the [employer].' " *Sawyer*, 322 Md. at 255, 587 A.2d at 470, quoting *Hopkins C. Co. v. Read Drug & C. Co.*, 124 Md. 210, 214, 92 A. 478, 480. Commissioner Larsen's disclosures were incident to the performance of his duties as Insurance Commissioner.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.*